**MISSOURI PACIFIC RAILROAD COMPANY, Appellant,**

v.

**Floyd SCHRECK, Appellee.**

**No. 9697.**

Court of Appeals of Texas, Texarkana.

May 23, 1989.

Rehearing Granted in Part and Opinion Modified June 27, 1989.

John R. Mercy, Atchley, Russell, Waldrop & Hlavinka, Texarkana, for appellant.

Doyle Curry, Jones, Jones, Curry & Roth, Marshall, for appellee.

CORNELIUS, Chief Justice.

Floyd Schreck sued the Missouri Pacific Railroad under the Federal Employers' Liability Act[1] and the Safety Appliance Act[2] to recover damages caused by an injury he received while working for the Railroad. The case was tried to the court without a jury, and judgment was rendered awarding Schreck $880,495.14.

The Railroad contends that there is no evidence or insufficient evidence to support the trial court's findings of injury and diminished earning capacity, and that the damages are excessive. We agree that the damages are excessive in some respects, and will order a remittitur of $134,829.14.

At the time of the accident, December 29, 1983, Schreck was working as a switchman. He was running along beside a caboose, holding a pin lifter on the coupler so that the caboose would uncouple, when he tripped on a piece of pipe partially buried in the ground. He heard his ankle snap and he fell to his left. His ankle began to swell immediately. He went to the hospital, where his ankle was x-rayed and bandaged. The next day he went to his family physician, Dr. Apple, who put a cast on his ankle. Schreck then went back to light duty with the Railroad for two months. Four months later, he went to see Dr. Berkey. Dr. Berkey put a cast on the ankle, but it did not help, and he later performed surgery on the ankle and removed bone chips. Schreck later went to four other doctors for consultation, x-rays, and/or therapy.

In the meantime, Schreck began meeting with Dennis Lane, the senior casualty representative of the Railroad, beginning in December of 1984. The Railroad began to pay Schreck advances because of his inability to work. On August 5, 1985, Schreck went to Lane and gave him the original of a report by Dr. Berkey, which stated that Schreck was not able to return to his previous position and that he should proceed to settle. On July 31, 1986, Schreck went to the Railroad office to pick up an advance, at which time he was informed that the company was unable to make further advancements. Schreck then presented himself to the train master's secretary to "mark up" for a return to work. When the Railroad heard about that, they made arrangements for Schreck to have another examination. On August 15, 1986, Lane wrote a letter to Schreck about an examination. Schreck did not report for the examination, and instead employed counsel to file suit. On September 2, 1986, after Schreck filed suit, the division service unit supervisor for the Railroad wrote him again to report for an examination on September 24. On advice of his attorney, Schreck did not report for the examination. In October 1986, Schreck was dismissed for refusing to obey the order of the superintendent. He was later reinstated.

At the Railroad's request, the trial court made findings of fact and conclusions of law. As to the issues of injury and damages, the trial court's findings were generalized as follows:

8. As a result of the injury sustained in this accident, the Plaintiff has undergone pain, suffering and mental anguish in the past; has lost earnings and benefits in the past; will undergo pain, suffering and mental anguish in the future; has a greatly diminished earning capacity in the future; and will incur reasonable and necessary medical expenses in the future.

9. After having made an appropriate reduction to present value for elements of future damage, the court finds that $880,495.14 will fairly and adequately compensate the Plaintiff for his injuries, for which sum the Plaintiff is entitled to

---

1. 45 U.S.C.A. §§ 51–60 (West 1986).

2. 45 U.S.C.A. § 2 (West Supp.1989).

judgment against the Defendant together with costs of court.

The Railroad did not request additional or more specific findings.

■ The thrust of the Railroad's first argument is that Schreck suffered no diminished earning capacity because (1) he is guaranteed a job with the Railroad at $148.50 per day, five days a week, pursuant to a "protected pay" agreement, and (2) in any event, he suffered only a sprained ankle, which has not significantly impaired his ability to work.

The agreement on which the Railroad relies is between the Missouri Pacific Railroad and the Railroad Yardmasters of America Union, to which Schreck belongs. The Railroad contends that the agreement requires it to pay the men who are listed in the agreement, which includes Schreck, $148.50 per day, five days per week, whether they work or not, provided they protect their seniority by being available for work if they are called. Schreck contends that the agreement requires that he be able to also work as a switchman, as well as a yardmaster, in order to maintain his protected status. The literal language of the agreement does provide as Schreck contends, but a Railroad witness testified that the Railroad does not interpret the agreement that way. The medical evidence establishes that Schreck is unable to work as a switchman. All parties concede that if Schreck is fired he loses the protected pay.

There is a conflict in the testimony as to the degree of protection the yardmasters agreement afforded Schreck. Certainly, the evidence is not so conclusive as to compel a conclusion by the trial court that Schreck suffered no diminished earning capacity because he was guaranteed the compensation under all circumstances.

Schreck was qualified both as a switchman and as a yardmaster. Both doctors agreed, and Schreck testified, that he could no longer perform the duties of a switchman, mainly because switchmen must walk or run on uneven and uncertain surfaces. The evidence conflicts as to whether Schreck can return and perform the duties of a yardmaster.

Dr. Elbaor saw Schreck three years after the injury. He based his initial diagnosis on the medical history given to him by Schreck and did not review the previous medical records. According to the history Schreck gave, there was pain in his ankle, the peroneal tendons were snapping and popping several times a day, and there was numbness in his foot. Schreck also said that he had cracked the ankle, had had a bone chip removed, and that his ankle was periodically collapsing.

Dr. Elbaor's examination revealed that Schreck had no swelling at the time, but there was tenderness on the outside peroneal tendons. He ordered tests and a Cybex evaluation. The bone scan showed the ankle was normal and ruled out a fracture. An arthrogram showed the articular surfaces were intact and there were no loose bodies, but irregularity was noticed. It was also revealed that there was a collection of old blood in the joint.

The Cybex evaluation is the only test that could confirm Schreck's subjective complaints. It indicated that the uninjured ankle, as well as the injured ankle, were both abnormal. They tested about the same, indicating a lack of sufficient strength to support the ankle.

Dr. Mauldin testified as a defense witness. He stated that the x-rays did not indicate a fracture, that when examining ankle injuries there are frequently calcifications or bone flakes that indicate prior injuries, and that based upon the records he concluded that Schreck's injury was primarily to the soft tissue. He did not find any objective, unstable clinical findings, and he concluded that Schreck had reached maximum improvement.

Schreck testified to intermittent pain in his ankle, looseness in the joint, and weakness. He has difficulty doing extended walking, and his ankle feels as if it is going to give way on him. He admitted that a yardmaster's job was mainly sit-down work, but he testified that he would have to move around a good bit, and at the yard where he would have to work there were several sets of stairs exposed to the weath-

er that he would have to climb several times a day, and that he could not do that with his ankle problems. The Railroad produced photographic evidence indicating that Schreck engaged in activities on numerous occasions, apparently without any difficulty from his ankle injury. Schreck explained that his trouble with his ankle was intermittent. There were times when it would not bother him very much, and other times when he could hardly stand or walk.

Considering the evidence as a whole, we cannot say there is insufficient evidence to support the trial court's finding that Schreck suffered a diminished earning capacity as a result of his injury.

We find, however, that portions of the damages are unauthorized and the award is therefore excessive.

The trial court found that Schreck was damaged by (1) pain and suffering, (2) mental anguish, (3) lost past earnings, (4) future medical expenses, and (5) diminished earning capacity in the future.

Schreck was earning approximately $3,000.00 per month. In addition, he received $14,012.97 annually in fringe benefits. However, the Railroad contributed only $9,671.72 of the fringe benefits. Schreck was injured on December 29, 1983. From the record, then, his lost earnings in the past would be:

| | |
|---|---|
| 1984–eight months | $ 30,448.00 |
| 1985–twelve months | 45,671.00 |
| 1986–twelve months | 45,671.00 |
| 1987–twelve months | 45,671.00 |
| 1988–three months, five days | 11,918.00 |
| TOTAL | $179,371.00 |
| Paid May 1984 | 115.00 |
| Advanced | 49,000.00 |
| Retirement | 8,750.00 |
| NET LOST WAGES AND BENEFITS | $121,514.00 |

The testimony showed that Schreck might need arthroscopic surgery in the future at an estimated cost of $7,500.00 to $15,000.00–$20,000.00, and might also need exploration of his peroneal tendons, which could cost another $4,000.00 or $5,000.00. Thus, the evidence will support a maximum award of $25,000.00 for future medical expenses.

■ There is no direct evidence that Schreck has suffered or will suffer mental anguish. The factfinder may infer mental anguish, however, when painful, serious injuries have occurred. *T. & P. R'y Co. v. Curry*, 64 Tex. 85 (1885); *Texas and New Orleans Railroad Company v. Cade*, 351 S.W.2d 663 (Tex.Civ.App.–Waco 1961, writ ref'd n.r.e.); *Verhalen v. Nash*, 330 S.W.2d 676 (Tex.Civ.App.–Texarkana 1959, writ ref'd n.r.e.). Schreck's counsel suggests that one dollar per hour for eight hours a day for Schreck's remaining life expectancy of thirty-nine years, or $102,200.00, would be a reasonable award for *mental anguish*, pain and suffering. Such a formula, however, presupposes almost constant pain. The most Schreck complained of was occasional or intermittent pain. Assuming that he would be in pain approximately half of the time and that mental anguish would accompany that pain, according to Schreck's formula the evidence supports an award of $51,100.00 for mental anguish, pain and suffering.

■ The trial court found that Schreck suffered a "greatly diminished" earning capacity. A specification of the percentage of diminished capacity was not requested. Schreck was earning $36,000.00 per year and receiving from the Railroad $9,671.00 per year in fringe benefits. He was forty-nine years old at the time of his injury and had a working expectancy of sixteen remaining years. If the trial court used the "total offset formula" to reduce the future earnings to present value,[3] his *total* lost future earnings would be $730,736.00. He

---

**3.** The "total offset" method is one of three methods available to the trier of fact in FELA cases to discount future earnings awards to present value. The total offset method assumes that the market interest rate at which the award could be invested will be totally offset by other factors affecting the after-tax stream of future income, such as inflation and wage increases. *See Monessen Southwestern Railway Co. v. Morgan,* 486 U.S. 330, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988); *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983). Neither party produced evidence of the effects of income taxes, inflation, wage increases or other factors affecting the present value of the future earnings. *See Norfolk & Western Railway Co. v. Liepelt,* 444 U.S. 490, 100 S.Ct.

has not suffered a total loss of earning capacity, however. Schreck suggests in his brief that a finding that he had a "residual earning capacity" of $9,000.00 per year would be reasonable. That would calculate to a diminished earning capacity of approximately eighty percent. We believe the evidence will support a finding that Schreck has suffered a diminished earning capacity of no more than seventy-five percent. Thus, compensation to replace the lost stream of income caused by his seventy-five percent diminution in earning capacity would be $548,052.00.

By way of recapitulation, the evidence supports the following amounts of damage:

| | |
|---|---|
| Lost wages in the past | $121,514.00 |
| Pain and suffering | 51,100.00 |
| Future medical expenses | 25,000.00 |
| 75% Diminished earning capacity | 548,052.00 |
| TOTAL | $745,666.00 |

Thus, the damage award clearly exceeds the amount that a reasonable trier of fact could find from the evidence, and is excessive under both the federal standard and the Texas remittitur practice. *Bridges v. Groendyke Transport, Inc.,* 553 F.2d 877 (5th Cir.1977); *Pope v. Moore,* 711 S.W.2d 622 (Tex.1986). We will therefore require a remittitur of $134,829.14 from the recovery allowed by the trial court.

If within fifteen days from the date of this opinion appellee Floyd Schreck will file a remittitur of the judgment below in the amount of $134,829.14, the judgment of the trial court will be affirmed; otherwise, the judgment will be reversed and the cause will be remanded for a new trial.

GRANT, Justice, dissenting.

This is a difficult case to review because we are faced with a large judgment with no specific findings of fact on the amounts of the various elements of damages. Since there was no request for additional findings of fact and no specific breakdown is required by law, we must review the record to determine if there is evidence to support the factfinder's determination of the total damages.

755, 62 L.Ed.2d 689 (1980); *Culver v. Slater*

The majority correctly states that the factfinder can infer mental anguish when a serious injury has occurred. The following words from the Texas Supreme Court, *T. & P. R'y Co. v. Curry,* 64 Tex. 85, 87–8 (1885), are just as true today as when they were written:

The law infers, when such injuries to the person are shown to have existed as are alleged and proved in this case, that physical pain resulted therefrom; for by common observation we know that in the ordinary operation of natural laws, pain is a necessary result of such injuries, unless the condition of the injured person be abnormal, which will not be presumed.

This is equally true as to mental suffering; for it is contrary to common experience and the laws of man's existence and nature that any sane, healthy and robust person by physical injuries may be made a cripple for life in a manner affecting his health, comfort or capacity, without mental pain resulting from the changed condition.

Although the majority recognizes this inference, their calculation of damages does not include a figure for mental anguish. The majority chooses to base its figure for pain and suffering on an example in Schreck's brief suggesting a dollar an hour for pain and suffering. Using this basis, the majority then reduces the suggested figure of $102,200 into approximately one half because the pain is intermittent. This is a misconstruction of the example, which does not purport to cover constant pain but merely offers a method of evaluating the pain and suffering. Schreck's brief then goes on to state that the $102,200 may be undercompensation in light of the fact that he faces the probability of surgery in the future. The brief goes on to suggest that two dollars per hour or an equally reasonable minimum wage figure for Schreck's pain and suffering was justified by the evidence. If the majority is to look to Schreck's brief for guidance, I would submit that all of the relevant section should be considered. However, because the fact-

Boat Co., 688 F.2d 280 (5th Cir.1982).

finder made a finding of mental anguish in addition to pain and suffering, and because there is a reasonable inference from the evidence to support mental anguish, additional damages should be allowed for mental anguish.

The majority construed the trial court's finding that Schreck suffered a greatly diminished earning capacity to mean that Schreck did not suffer a total loss of earning capacity. The majority then found that Schreck suffered a diminished earning capacity of seventy-five percent. There is nothing is the record to suggest the seventy-five percent determination. In arriving at this figure, they speculate.

I respectfully dissent.

## ON MOTION FOR REHEARING

In his motion for rehearing, Schreck suggests that we have miscalculated the amount advanced and the fringe benefits.

In computing lost wages and benefits, we subtracted $49,000.00 as the amount advanced and $8,750.00 advanced from his retirement account. The correct amount, as stipulated by the parties, is $41,900.00.

Schreck also alleges that we miscalculated fringe benefits in determining lost wages and benefits. We originally found the actual amount contributed by the Railroad was $9,671.00. However, Schreck correctly argues the amount, when figured on a yearly basis, is $14,012.00. Thus, we modify our conclusions as to lost earnings and benefits as follows:

|  | Original Figure | Corrected Figure |
|---|---|---|
| 1984—eight months | $ 30,448.00 | $ 33,341.00 |
| 1985—twelve months | 45,671.00 | 50,012.00 |
| 1986—twelve months | 45,671.00 | 50,012.00 |
| 1987—twelve months | 45,671.00 | 50,012.00 |
| 1988—three months, five days | 11,918.00 | 12,503.00 |
|  | $179,371.00 | $195,880.00 |
| Paid May 1984 | 115.00 | 115.00 |
| Advanced | 49,000.00 | 41,900.00 |
| Retirement | 8,750.00 | 8,750.00 |
| NET LOST WAGES AND BENEFITS | $121,514.00 | $145,115.00 |

Based upon the corrected figures and our computation of diminished earning capacity, we must also modify the $548,052.00 we originally found as diminished earning capacity. Therefore, the corrected recapitulation shows the following amounts of damage:

|  | Original Figure | Corrected Figure |
|---|---|---|
| Lost wages in the past | $121,514.00 | $145,115.00 |
| Pain and suffering | 51,100.00 | 51,100.00 |
| Future medical expenses | 25,000.00 | 25,000.00 |
| 75% diminished earning capacity | 548,052.00 | 600,155.00 |
|  | $745,666.00 | $821,370.00 |

The motion for rehearing is granted in part and our opinion modified as here noted.

If within fifteen days from the date of this opinion Floyd Schreck will file a remittitur of the judgment below in the amount of $59,125.00, the judgment of the trial court will be affirmed; otherwise, the judgment will be reversed and the cause remanded for a new trial.