# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00241-CV

**Laura Ramirez and Adolfo Ramirez/Fifth Club, Inc.
and David A. West, Appellants**

**v.**

**Fifth Club, Inc.; David A. West; and Luis a/k/a Louis Medrano/
Roberto Ramirez, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
NO. GN-102,636, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING**

## O P I N I O N

This case stems from an altercation at an Austin nightclub. Luis a/k/a Louis Medrano

and David A. West were employed to work as security personnel for the club. Roberto, Adolfo, and

Laura Ramirez[1] were all allegedly assaulted by West or Medrano. Following a ten-day jury trial, a

jury found Fifth Club and West liable for injuries to Roberto but determined that West and Medrano

were not liable to Adolfo and Laura because they were functioning as peace officers and entitled to

official immunity.

Adolfo and Laura appeal, arguing West and Medrano were not entitled to official

immunity and that the district court erred in submitting a jury question on official immunity. Fifth

---

[1] For ease of reference, we refer to Roberto, Adolfo and Laura Ramirez by their first names.

Club and West appeal, contesting the legal and factual sufficiency of seven jury findings favoring Roberto. We will affirm the judgment of the district court.

## BACKGROUND

**Factual Background**

The facts of this case were hotly contested at trial. What is undisputed is that on September 16, 2000, Roberto Ramirez and his brother, Adolfo Ramirez, attended a party to celebrate the baptism of their cousin. After the party, around 12:30 or 1:00 a.m. on September 17, Roberto and Adolfo arrived at Club Rodeo[2] with some friends. Roberto and Adolfo were, at some point, denied admission into Club Rodeo. West and Medrano, both of whom were working security[3] in the Club Rodeo parking lot, were signaled by the Club Rodeo doorman and proceeded to the doorway of the club. An altercation between Roberto and West ensued, during which Roberto's head struck a wall, fracturing a bone in his skull. Apparently, Adolfo intervened in the altercation between Roberto and West, causing Medrano to restrain Adolfo.

Eventually, West and Medrano took Roberto, who was unconscious, and Adolfo into the parking lot and handcuffed them. Laura Ramirez, who was dropping off another brother at Club Rodeo, soon arrived to find her brothers Roberto, who had regained consciousness, and Adolfo lying handcuffed on the parking-lot pavement. She and West became embroiled in a verbal altercation, and West eventually handcuffed Laura and placed her under arrest as well. Both Medrano and an

---

[2] Club Rodeo is owned by Fifth Club, Inc.

[3] West and Medrano were employed as full-time campus police officers at Huston-Tillotson College. The night of the incident pertinent to this case, both were working as security for Fifth Club at Club Rodeo. They were wearing their duty belts and black shirts that stated "POLICE."

eyewitness called 911; Austin Police Department (APD) officers soon arrived and transported Roberto, Adolfo, and Laura Ramirez to the city jail.

**Trial Proceedings**

Roberto sued West for assault, false imprisonment, malicious prosecution, intentional infliction of emotional distress, negligence, and malice, and he sued Fifth Club for negligence and respondeat superior.

Adolfo sued Medrano for assault, false imprisonment, malicious prosecution, intentional infliction of emotional distress, negligence, and malice. He sued West for negligence and malice, and he sued Fifth Club for negligence and respondeat superior.

Laura sued West for assault, false imprisonment, malicious prosecution, intentional infliction of emotional distress, negligence, and malice. Laura sued Fifth Club for negligence and respondeat superior.

West and Medrano asserted the affirmative defense of official immunity. At the time of this incident, peace officers outside of their jurisdiction could make a warrantless arrest of a person who commits a felony, a breach of the peace, or public intoxication within the officer's presence or view. *See* Act of May 29, 1993, 73d Leg., R.S., ch. 900, § 3.02, 1993 Tex. Gen. Laws 3586, 3715 (amended 2003) (current version at Tex. Code Crim. Proc. Ann. art. 14.03(d) (West Supp. 2004)) (hereinafter cited as Former Tex. Code Crim. Proc. Ann. art. 14.03(d)).[4] West and

_____

[4] We will refer to the version of article 14.03(d) in effect at the time of the incident in question as "former article 14.03(d)." The legislature amended article 14.03(d) in 2003 to also permit arrests when peace officers observe additional alcoholic-beverage offenses. *See* Act of May 25, 2003, 78th Leg., R.S., ch. 897, § 1, 2003 Tex. Gen. Laws 2723, 2723 (codified as an amendment

Medrano argued that they observed Roberto, Adolfo, and Laura commit felonies, breaches of the peace, public intoxication, or some combination thereof. Because West and Medrano were commissioned by Huston-Tillotson College to function as peace officers, they assert they were entitled to function as peace officers and were therefore entitled to official immunity. *See id.*; *see also* Tex. Educ. Code Ann. § 51.212 (West 1996) (permitting private institutions of higher education to commission campus security personnel); Tex. Code Crim. Proc. Ann. art. 2.12(8) (West Supp. 2004) (defining officers commissioned under chapter 51, education code, as "peace officers").

At the conclusion of a ten-day jury trial, the district court submitted questions to the jury regarding official immunity. The jury granted official immunity to West for his actions toward Laura and to Medrano for his actions toward Adolfo, but refused to grant official immunity to West for his actions toward Roberto.

Based on its official-immunity findings, the jury did not reach any liability questions stemming from Laura's and Adolfo's complaints. The jury did, however, find both West and Fifth Club liable to Roberto and awarded him $80,000 for physical pain and mental anguish sustained in the past, $20,000 for mental anguish that he will reasonably sustain in the future, $2,100 for loss of earning capacity in the past, $7,000 for physical impairment sustained in the past, $1,198 for medical care in the past, and $35,000 as exemplary damages against Fifth Club.

---

to Tex. Code Crim. Proc. Ann. art. 14.03(d) (West Supp. 2004)); *see also* Tex. Pen. Code Ann. §§ 49.01-.12 (West 2003 & Supp. 2004) (additional alcoholic-beverage offenses included by 2003 amendment). Although some of the other statutes involved in this case have been amended since the incident in question, none of those changes affect our analysis. For convenience, we will cite to the current versions of all other statutes.

**Issues on Appeal**

Adolfo and Laura appeal, arguing that the submission of the immunity question to the jury was in error because the education code only authorized West and Medrano to function as peace officers while working for Huston-Tillotson. *See* Tex. Educ. Code Ann. § 51.212. They therefore request that the cause be remanded so a jury can determine whether Fifth Club, West, or Medrano are liable to Adolfo and Laura for the injuries they allegedly sustained.

Fifth Club and West also appeal and argue that the evidence is legally and factually insufficient to support the jury's finding that (1) Fifth Club is responsible for the acts of West; (2) Fifth Club was negligent and that its proportionate responsibility for the damages to Roberto was 55 percent; (3) Roberto was entitled to an award of $80,000 for past physical pain and mental anguish and $20,000 for future physical pain and mental anguish; (4) Roberto was entitled to an award of $7,000 for physical impairment in the past; (5) Fifth Club or West acted with malice; (6) Fifth Club should pay Roberto $35,000 in exemplary damages; and (7) West was not entitled to official immunity.

## DISCUSSION

**Laura's and Adolfo's Issue: Authority to Act as "Peace Officers"**

Laura and Adolfo argue in one issue that they are entitled to a remand because the district court improperly submitted to the jury a question regarding official immunity for West and Medrano. West and Medrano were both employed by Huston-Tillotson College, a private institution of higher education, as campus security personnel. In empowering private institutions to hire security personnel, the legislature provided:

5

The governing boards of private institutions of higher education, including private junior colleges, are authorized to employ and commission campus security personnel for the purpose of enforcing the law of this state on the campuses of private institutions of higher education. Any officer commissioned under the provisions of this section is vested with all the powers, privileges, and immunities of peace officers *while on the property* under the control and jurisdiction of the respective private institution of higher education *or otherwise in the performance of his assigned duties*.

Tex. Educ. Code Ann. § 51.212 (emphasis added). Because this section states that a campus officer has the powers, privileges, and immunities of peace officers "while on the property . . . or otherwise in the performance of his assigned duties," Laura and Adolfo argue that West and Medrano could not function as peace officers while working at Club Rodeo.

However, article 2.12 of the code of criminal procedure unambiguously defines "officers commissioned under . . . Subchapter E, Chapter 51, Education Code" as "peace officers," Tex. Code Crim. Proc. Ann. art. 2.12(8),[5] and former article 14.03(d) provides:

A peace officer *who is outside his jurisdiction* may arrest, without warrant, a person who commits an offense within the officer's presence or view, if the offense is a felony, a violation of Title 9, Chapter 42, Penal Code [disorderly conduct and related offenses], a breach of the peace, or an offense under Section 49.02, Penal Code [public intoxication]. A peace officer making an arrest under this subsection shall, as soon as practicable after making the arrest, notify a law enforcement agency having jurisdiction where the arrest was made. The law enforcement agency shall then take custody of the person committing the offense and take the person before a magistrate in compliance with Article 14.06 of this code.

---

[5] Section 51.212 of the education code is contained within subchapter E, entitled "Protection of Buildings and Grounds." *See* Tex. Educ. Code Ann. §§ 51.201-.216 (West 1996 & Supp. 2004).

Former Tex. Code Crim. Proc. Ann. art. 14.03(d) (emphasis added). We believe the interaction between these statutes is clear. Section 51.212 of the education code establishes the jurisdiction for campus security personnel. Within this jurisdiction, campus security personnel are "vested with *all* the powers, privileges, and immunities of peace officers." Tex. Educ. Code Ann. § 51.212 (emphasis added). But former article 14.03(d) acts as an exception to the general rule that a peace officer's authority to act is limited to his own geographic jurisdiction. *Brother v. State*, 85 S.W.3d 377, 383 & n.3 (Tex. App.—Fort Worth 2002, no pet.); *see also Angel v. State*, 740 S.W.2d 727, 734 (Tex. Crim. App. 1987) (plurality opinion) (legislature likely used term "jurisdiction" to restrict geographic scope of peace officer's power, rights, and authority). Outside of their primary jurisdiction, officers are vested with the *limited* authority to arrest for certain enumerated offenses committed within the officer's presence or view. Former Tex. Code Crim. Proc. Ann. art. 14.03(d).

After thoroughly analyzing the education code, the code of criminal procedure, and Texas case law, Laura and Adolfo argue that interpreting former article 14.03(d) to include campus security personnel commissioned under section 51.212 of the education code would lead to absurd results. First, they argue that article 2.123 of the code of criminal procedure expressly addresses the limited circumstances under which officers commissioned by private institutions may act as peace officers outside their ordinary jurisdiction. This section provides in part:

> (a) Within counties under 200,000 population, the chief of police of a municipality or the sheriff of the county, if the institution is outside the corporate limits of a municipality, that has jurisdiction over the geographical area of a private institution of higher education, provided the governing board of such institution consents, may appoint up to 50 peace officers who are commissioned under Section 51.212, Education Code, and who are employed by a private institution of higher education located in the municipality or county, to serve as adjunct

7

police officers of the municipality or county. Officers appointed under this article shall aid law enforcement agencies in the protection of the municipality or county in a geographical area that is designated by agreement on an annual basis between the appointing chief of police or sheriff and the private institution.

(b) The geographical area that is subject to designation under Subsection (a) of this article may include only the private institution's campus area and an area that:

(1) is adjacent to the campus of the private institution;

(2) does not extend further than a distance of one mile from the perimeter of the campus of the private institution; and

(3) is inhabited primarily by students or employees of the private institution.

(c) A peace officer serving as an adjunct police officer may make arrests and exercise all authority given peace officers under this code only within the geographical area designated by agreement between the appointing chief of police or sheriff and the private institution.

(d) A peace officer serving as an adjunct police officer has all the rights, privileges, and immunities of a peace officer but is not entitled to state compensation and retirement benefits normally provided by the state to a peace officer.

Tex. Code Crim. Proc. Ann. art. 2.123(a)-(d) (West Supp. 2004). Laura and Adolfo argue that this specific section, which explains the circumstances under which a campus security officer at a private educational institution may function outside of his jurisdiction, should control over the more general former article 14.03(d). *See, e.g.*, *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 901 (Tex. 2000) ("more specific statute controls over the more general"). However, this rule of statutory construction only applies when different code provisions are "irreconcilable." *See id.*; *see also* Tex. Gov't Code Ann. § 311.026(a) (West 1998) ("If a general provision conflicts with a special or local provision, the provisions shall be construed, if possible, so that effect is given to both.").

8

Here, we do not find that article 2.123 and former article 14.03(d) conflict. The fundamental difference between these two articles is that article 2.123 provides the specific circumstances, including geographic restrictions, for when a campus security officer may exercise *all* the rights, privileges, and immunities of a peace officer, while former article 14.03(d) provides an additional situation where a peace officer, including a campus security officer, can exercise the *limited* function of arresting an individual for specific offenses committed within the officer's presence or view. *Compare* Tex. Code Crim. Proc. Ann. art. 2.123(d) ("peace officer serving as an adjunct police officer has all the rights, privileges, and immunities of a peace officer"), *with* Former Tex. Code Crim. Proc. Ann. art. 14.03(d) (peace officer must follow procedure for making warrantless arrest outside his jurisdiction for *limited* range of offenses). Article 2.123 allows a campus security officer functioning as an adjunct officer to make *all* arrests, but only within a specified geographic area. Tex. Code Crim. Proc. Ann. art. 2.123(c). Former article 14.03(d), on the other hand, allows a campus security officer to make a warrantless arrest without regard to geographic boundaries within the state *only if* the offense is committed "within the officer's presence or view" and *only if* the offense observed is specifically listed. *See* Former Tex. Code Crim. Proc. Ann. art. 14.03(d). We conclude that the plain language of these two articles does not conflict, and we overrule Laura's and Adolfo's issue insofar as it is based on article 2.123 of the code of criminal procedure.

Next, Laura and Adolfo point to section 51.203 of the education code to support their argument that West and Medrano were not entitled to official immunity. Section 51.203 provides in part:

9

(a)  The governing boards of each state institution of higher education and public technical institute may employ and commission peace officers for the purpose of carrying out the provisions of this subchapter. The primary jurisdiction of a peace officer commissioned under this section includes all counties in which property is owned, leased, rented, or otherwise under the control of the institution of higher education or public technical institute that employs the peace officer.

(b)  Within a peace officer's primary jurisdiction, a peace officer commissioned under this section:

   (1)  is vested with all the powers, privileges, and immunities of peace officers;

   (2)  may, in accordance with Chapter 14, Code of Criminal Procedure, arrest without a warrant any person who violates a law of the state; and

   (3)  may enforce all traffic laws on streets and highways.

(c)  Outside a peace officer's primary jurisdiction a peace officer commissioned under this section is vested with all the powers, privileges, and immunities of peace officers and may arrest any person who violates any law of the state if the peace officer:

   (1)  is summoned by another law enforcement agency to provide assistance;

   (2)  is assisting another law enforcement agency; or

   (3)  is otherwise performing his duties as a peace officer for the institution of higher education or public technical institute that employs the peace officer.

Tex. Educ. Code Ann. § 51.203(a)-(c) (West Supp. 2004).

Laura and Adolfo argue that construing former article 14.03(d) to include campus security personnel commissioned by *private* institutions under section 51.212 of the education code would empower such officers with *more* power than similar officers commissioned by *public* institutions of higher education under section 51.203 of the education code. This argument stems from the fact that section 51.203(c) limits the instances when an officer commissioned by a *public*

10

institution may act outside of his primary jurisdiction, yet section 51.212 contains no such restrictions. *See id.* §§ 51.203(c), .212. Therefore, according to Laura and Adolfo, construing former article 14.03(d) to include campus security personnel at private institutions would grant them *more* power than similar officers at public institutions, who can only act outside of their jurisdiction when the limited circumstances described in section 51.203(c) apply.

We disagree with Laura's and Adolfo's reading of the statutes in question. Section 51.203(c) of the education code describes three instances when a campus officer at a public institution who is outside of his primary jurisdiction is "vested with *all* the powers, privileges, and immunities of peace officers and may arrest any person who violates *any* law of the state." *Id.* § 51.203(c) (emphasis added). Section 51.203(c) is narrowly tailored to describe the circumstances under which a campus police officer maintains *full* peace-officer status, even if outside the officer's jurisdiction.[6] This does not conflict with former article 14.03(d), which empowers campus police officers—those employed by public and private institutions alike—to make warrantless arrests for a small number of offenses committed within the officer's presence or view. *See* Former Tex. Code Crim. Proc. Ann. art. 14.03(d). Because section 14.03(d) applies equally to campus officers employed by public institutions and campus officers employed by private institutions and is not in conflict with section 51.203 of the education code, we overrule Laura's and Adolfo's issue insofar as it is based on section 51.203 of the education code.

---

[6] This is similar to the extension of full peace-officer status to campus officers employed by *private* institutions found in article 2.123 of the code of criminal procedure. *See* Tex. Code Crim. Proc. Ann. art. 2.123 (West Supp. 2004).

11

Finally, Laura and Adolfo cite numerous cases in support of their argument that former article 14.03(d) cannot apply to West and Medrano, but these cases are easily distinguishable from the situation now before us. *See, e.g.*, *Perkins v. State*, 812 S.W.2d 326 (Tex. Crim. App. 1991) (article 14.03(d) not at issue); *Brother v. State*, 85 S.W.3d 377 (Tex. App.—Fort Worth 2002, no pet.) (same); *State v. Backus*, 881 S.W.2d 591 (Tex. App.—Austin 1994, pet. ref'd) (pertinent facts occurred before legislature amended former article 14.03(d) to include additional alcoholic-beverage offenses); *State v. Carroll*, 855 S.W.2d 128 (Tex. App.—Austin 1993, no pet.) (same); *Garza v. State*, 822 S.W.2d 174 (Tex. App.—San Antonio 1991, no pet.) (article 14.03(d) not at issue). In citing these cases, Laura and Adolfo focus on where West and Medrano were empowered to function with *full* peace-officer authority, yet they fail to address that the legislature specifically provided for *limited* situations in which peace officers, *outside of their jurisdiction*, may make warrantless arrests for a limited number of offenses committed within their presence or view. *See* Former Tex. Code Crim. Proc. Ann. art. 14.03(d).

We conclude that article 2.12(8) and former article 14.03(d) of the code of criminal procedure are clear and unambiguous and do not conflict with sections 51.203 or 51.212 of the education code, or with article 2.123 of the code of criminal procedure. *See* Tex. Code Crim. Proc. Ann. arts. 2.12(8), 2.123; Former Tex. Code Crim. Proc. Ann. art. 14.03(d); Tex. Educ. Code Ann. §§ 51.203, .212. We therefore hold that the district court properly submitted the question of official immunity to the jury.[7] We overrule Laura's and Adolfo's sole issue.

---

[7] Because the question of whether off-duty peace officers are entitled to official immunity requires an examination of the officer's conduct and a delineation of those actions taken in a private capacity from those actions performed as a public servant, the determination of this question presents

**Fifth Club's and West's Issues:  Legal and Factual Sufficiency**

In seven issues, Fifth Club and West challenge the legal and factual sufficiency of the jury's findings.  When reviewing a no-evidence challenge, we consider all the evidence in the light most favorable to the judgment, making every reasonable inference in its favor.  *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285-86 (Tex. 1998).  We will uphold the jury's finding if more than a scintilla of evidence supports it.  *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995).  The evidence supporting a finding is more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case.  *Id.*  When reviewing a factual-sufficiency challenge, we consider all the evidence and uphold the jury's verdict unless we find that (1) the evidence is too weak to support the finding or (2) the finding is so against the overwhelming weight of the evidence as to be manifestly unjust.  *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Because all seven issues turn on an examination of the evidence presented at trial, a recounting of the evidence before the jury is necessary.  The parties hotly contested what actually happened at Club Rodeo, and we will address their different accounts of the incident in turn.

*The Plaintiffs' Account*

Roberto and Adolfo[8] both testified that when they were waiting in line in a front hallway to enter Club Rodeo, the club doorman allowed two men to cut in front of Roberto and

---

embedded fact issues that are best left to the trier of fact.

[8] Two of Adolfo's and Roberto's friends also testified via deposition.  Their testimony is consistent with Adolfo's and Roberto's testimony.

13

Adolfo. Adolfo complained to the doorman, who then said Adolfo was not getting in. Adolfo apologized and showed his identification to the doorman, who said, "Get the [expletive] out of here." Roberto told the doorman not to speak to Adolfo that way, and the doorman then said Roberto was not getting into Club Rodeo either.

At this point, Roberto was under the impression that his friends, who were at the cash register, had already paid for his and Adolfo's admission. He told the doorman that if their money was returned, he and Adolfo would leave. Upon learning that their friends had not, in fact, already paid for their admission, Roberto and Adolfo turned around to leave. As Roberto was walking toward the exit, West approached from behind and grabbed his hands.[9] When Roberto resisted West's effort to restrain Roberto's hands, West allegedly "got very mad" and pushed Roberto's face against a limestone or concrete wall, fracturing a bone in Roberto's skull and rendering him unconscious. When Roberto regained consciousness, he was lying handcuffed in the parking lot.

Adolfo testified that after West pushed Roberto into the wall, West "was beating [Roberto] several times," prompting Medrano to tell West "that was enough." When Adolfo tried to push West away from Roberto, Medrano grabbed Adolfo by the neck and threw him to the floor. Medrano dragged Adolfo outside, where Medrano and West allegedly kicked both Adolfo and Roberto after they had been handcuffed.

---

[9] Roberto and Adolfo testified that they did not know there were purported peace officers in the club, and West and Medrano had not, at this point, announced their presence as peace officers.

14

Laura Ramirez, who was dropping off another brother at Club Rodeo, soon arrived to find her brothers Roberto and Adolfo lying handcuffed on the parking-lot pavement. She exited her vehicle and attempted to ascertain what had happened from West, who was initially non-responsive. West told Laura to move her car, but Laura attempted to move closer to Roberto, whose face was swollen and bleeding. West again told Laura to move her car, allegedly telling her "it wasn't [her] [expletive] business what was happening there."

Laura inquired about Roberto's injuries, which West admitted to causing. Laura stated she was going to call an attorney and returned to her truck to get her cellular phone. When Laura obtained her phone, West grabbed her from behind, threw her against a car, handcuffed her, told her she was under arrest, and pushed her to the ground. While Laura was handcuffed on the ground, Thomas Romero, Club Rodeo's manager at that time, purportedly laughed at and mocked Laura's predicament. Laura testified that at no point did West ever identify himself as a police officer, and at no point did she touch West or Medrano.

APD officers arrived after being called by both a witness to the incident and Medrano. APD officers transported Adolfo, Roberto, and Laura to jail. Roberto and Adolfo spent two days in jail, and were subsequently no-billed by the grand jury for assault on a police officer, the only crime with which they were charged. Laura spent three days in jail, purportedly for assault on a police officer, but was never charged with any crime.

*The Defendants' Account*

Fifth Club, West, and Medrano present a much different account of the events of September 17. Fifth Club's doorman testified that when he asked for Roberto's identification to get

15

into the club, Roberto seemed intoxicated and shoved his ID against the doorman's chest. The doorman asked Roberto to leave, and Roberto refused. The doorman threatened to call the police if Roberto did not leave, and Roberto again refused. The doorman then signaled with a flashlight to West and Medrano that they were needed inside the club.

West was sitting in his car in the parking lot when the doorman signaled that he and Medrano, who was near the entrance, were needed inside the club. West and Medrano proceeded inside the club, where the doorman informed them that Roberto was intoxicated and should not enter the club. Roberto and Adolfo refused to leave, at which point Medrano grabbed Roberto by the wrist or hand to escort him out. Roberto pulled away and was then grabbed by West. As West was escorting Roberto to the door, Roberto kneed West in the groin, and West lost his grip on Roberto. West then pushed Roberto against a wall. Roberto attempted to strike West, at which point West began to throw a forearm at Roberto. Adolfo then punched West in the head, causing West and Roberto to fall either against the wall or onto the floor. Roberto was not moving, and West surmised he may have passed out. West handcuffed Roberto and moved him outside.

After Adolfo punched West, Medrano pushed Adolfo out the door of the club, and Adolfo tried to kick and punch Medrano. Both Medrano and Adolfo fell to the ground outside the door to the club. Adolfo repeatedly kicked Medrano while Adolfo was on the ground, causing Medrano to strike Adolfo with a flashlight several times while saying, "Police, stop kicking me." Medrano eventually subdued and handcuffed Adolfo.

Laura soon arrived, parking her car where it would block APD efforts to arrest and transport Roberto and Adolfo. She immediately threatened to sue West, who repeatedly asked her

16

to move her car. West escorted Laura by the elbow to her car, and Laura snatched her elbow away from West and elbowed him. West then informed Laura she was under arrest and handcuffed her.[10] Romero, Club Rodeo's manager, testified via deposition that he simply told Laura, "If you calm down, they'll probably let you go." APD officers then transported Roberto, Adolfo, and Laura to jail.

*Issue 7: Whether West was Entitled to Official Immunity*

Fifth Club and West argue that West was entitled to official immunity as a matter of law because he was functioning as a peace officer during the early morning hours of September 17.[11] This argument, however, presupposes that Roberto committed one of the enumerated offenses in former article 14.03(d) within West's presence or view, thereby entitling West to function as a peace officer. *See* Former Tex. Code Crim. Proc. Ann. art. 14.03(d).[12] To be entitled to immunity, West

---

[10] West testified Laura had her cellular phone already and was not going to her truck to get it.

[11] Fifth Club cites to article 2.13 of the code of criminal procedure, which states: "It is the duty of every peace officer to preserve the peace within the officer's jurisdiction." Tex. Code Crim. Proc. Ann. art. 2.13(a) (West Supp. 2004). However, this language is limited by its terms to a peace officer's jurisdiction. It is former article 14.03(d) that allows a peace officer to perform a warrantless arrest outside his jurisdiction, and only under the limited circumstances set forth therein. *See* Former Tex. Code Crim. Proc. Ann. art. 14.03(d).

[12] Although in no way controlling, Roberto and Adolfo were no-billed by the grand jury for assault on a police officer, allegedly committed in West's presence or view. We note that the standard for a grand jury to indict is the same as the standard for a peace officer outside of his jurisdiction to make a warrantless arrest under former article 14.03(d). *Compare Rodriguez v. State*, 104 S.W.3d 87, 93 (Tex. Crim. App. 2003) (grand jury requires sufficient probable cause to indict), *with State v. Kurtz*, 111 S.W.3d 315, 322 (Tex. App.—Dallas 2003, pet. granted) (arrest under article 14.03(d) must be upon probable cause), *and Yeager v. State*, 23 S.W.3d 566, 572 (Tex. App.—Waco 2000) (citing *Amores v. State*, 816 S.W.2d 407, 413 (Tex. Crim. App. 1991)) (same), *rev'd on other grounds*, 104 S.W.3d 103 (Tex. Crim. App. 2003).

17

was required to show that he was acting at all relevant times pursuant to his authority as a peace officer and that his actions were discretionary and in good faith. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994).

Here, the district court presented to the jury the following question and instructions regarding official immunity:

> Could a reasonably prudent officer, under the same or similar circumstances, have believed that the disputed conduct of David West was justified based on the information David West possessed when the conduct occurred?
>
> You are instructed that David West may arrest someone if he reasonably believed the person committed an offense within his presence or view if the offense is a felony, a breach of the peace, public intoxication, disorderly conduct, criminal trespass, interference with an arrest, assault, assault on a police officer, or failure to obey a lawful order.
>
> The term "breach of the peace" includes all violations of the public peace or order, or decorum; in other words, it signifies the offense of disturbing the public peace or tranquility enjoyed by the citizens of a community; a disturbance of the public tranquility by any act or conduct inciting to violence or tending to provoke or excite others to break the peace; a disturbance of public order by an act of violence, or by any act likely to produce violence, or which, by causing consternation and alarm disturbs the peace and quiet of the community.
>
> A person commits an offense if the person appears in a public place while intoxicated to the degree that the person may endanger the person or another.

The jury was essentially asked to determine two questions. First, whether West was entitled to "switch hats" and transform from his role as private security for the club into a separate role as a peace officer. Next, if West was acting within his authority as a peace officer, the jury was asked to determine whether his actions were in good faith. Fifth Club and West argue that the evidence conclusively shows that West acted as a "reasonably prudent officer" and was entitled to

18

immunity, but they ignore that the jury, from the evidence presented, could have concluded that Roberto never committed a crime within West's presence or view that entitled him to function as a peace officer under former article 14.03(d) and arrest Roberto. There is, at best, conflicting evidence of whether Roberto committed any crimes at all, and the jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

Additionally, Fifth Club and West assert that because West and another one of their witnesses testified that West's actions were reasonable, the jury's refusal to grant official immunity to West was based on factually insufficient evidence. We disagree. Even Officer Payne, an expert witness for Fifth Club and West, testified that he had never seen an officer slam someone's head into a wall, and had never seen an officer hit a suspect who was already handcuffed, as West was alleged to have done. Officer Tidwell, an expert witness for Roberto, testified that the crimes allegedly committed by Roberto would not justify an officer slamming a suspect's head against a wall. Officer Tidwell also testified it would not have been reasonable for West to grab Roberto's arms from behind without announcing his presence as a police officer. We hold the evidence was both legally and factually sufficient to support the jury's finding that West was not entitled to official immunity for his actions toward Roberto, and we overrule Fifth Club's and West's seventh issue.

*Issue 1: Whether Fifth Club is Responsible for West's Actions*

The district court submitted to the jury the following question: "On the occasion in question was David West acting in the furtherance of a mission for the benefit of Fifth Club, Inc. and

19

subject to control by Fifth Club, Inc. as to the details of the mission?"[13] The jury answered, "Yes." Fifth Club now asserts that it is not responsible for West's actions because he was acting as a peace officer.

This Court has previously explained the process for determining when a security guard ceases functioning as an employee and functions instead as a peace officer:

> In determining the status of a police officer, we ask "in what capacity was the officer acting at the time he committed the acts for which the complaint is made?" If the officer is performing a public duty, such as the enforcement of general laws, the officer's private employer incurs no vicarious responsibility for that officer's acts, even though the employer may have directed the activities. If the officer was engaged in *protecting the employer's property, ejecting trespassers, or enforcing rules and regulations promulgated by the employer*, however, the trier of fact decides whether the officer was acting as a public officer or as a servant of the employer.

*Mansfield v. C.F. Bent Tree Apartment Ltd. P'ship*, 37 S.W.3d 145, 149 (Tex. App.—Austin 2001, no pet.) (emphasis added). As explained above, there is both legally and factually sufficient evidence to support a conclusion that West was not acting as a peace officer under former article 14.03(d) when Roberto's injuries were inflicted. We therefore reject Fifth Club's contention that it is not responsible for West's actions because he was functioning as a peace officer.

---

[13] This question conforms to the State Bar of Texas Pattern Jury Charge for vicarious liability involving a nonemployee. Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges*, General Negligence PJC 7.10 (1998).

20

Fifth Club also asserts it is not responsible for West's actions because he was an independent contractor. In the employment context, it is the right of control that commonly justifies imposing liability on the employer for the actions of the employee, and an employer may be vicariously liable for his independent contractor's acts if he retains the "right to control the means, methods, or details of the independent contractor's work." *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 542 & n.91 (Tex. 2003) (quoting *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998)).

An employer can also be liable for the acts of an independent contractor if the "personal character exception" applies. *See Ross v. Texas One P'ship*, 796 S.W.2d 206, 213 (Tex. App.—Dallas 1990), *writ denied*, 806 S.W.2d 222 (Tex. 1991) (per curiam); *Duran v. Furr's Supermarkets, Inc.*, 921 S.W.2d 778, 787 (Tex. App.—El Paso 1996, writ denied). If the duties being carried out by an independent contractor are of a personal character owed to the public by one adopting measures to protect his property, owners and operators of enterprises cannot, by securing independent contractors for the purpose of protecting property, obtain immunity from liability for at least the intentional torts of those hired. *See Ross*, 796 S.W.2d at 213; *Duran*, 921 S.W.2d at 787-88.

Here, the uncontroverted evidence established that the doorman signaled West and Medrano to enter the club and remove Roberto and Adolfo. The doorman then directed West and Medrano to eject Adolfo and Roberto, which they did. Salim Salem, one of Fifth Club's owners, testified that it was the club's responsibility to ensure the safety of patrons and that one of the

21

reasons for hiring outside security like West was to deter crime, both inside and outside the club. This is evidence that West was carrying out the exact functions he was hired to perform, and was performing those functions at the direction of Club Rodeo employees. We hold that the record contains both legally and factually sufficient evidence that West was acting in the furtherance of a mission for the benefit of Fifth Club and subject to control by Fifth Club as to the details of the mission. We overrule Fifth Club's and West's first issue.

*Issue 2: Fifth's Club's Negligence and Apportionment of Responsibility*

Fifth Club and West next argue there is insufficient evidence to support the jury's finding that Fifth Club was negligent and that its proportionate responsibility was 55 percent. Roberto claims that Fifth Club was negligent in both its hiring and retention of West and Medrano. Salim Salem testified that he did not personally hire the off-duty peace officers who worked as outside security, but instead entrusted another officer to make these arrangements. Fifth Club gave this officer no instructions, did not require applicants to fill out applications, and was not even aware of which officers were working. Although Fifth Club had policy manuals for inside security, including directives not to use profanity with customers because profanity can "escalate[] an incident," the manuals were not provided to security personnel working outside. Finally, Fifth Club failed to perform background checks on any of the security personnel working outside. Roberto presented expert testimony that Fifth Club's conduct in hiring and retaining West constituted gross

22

negligence and proximately caused the injuries to Roberto.[14] We conclude there was legally and factually sufficient evidence to support the jury's finding that Fifth Club was negligent.

Regarding the jury's apportionment of 55 percent of the responsibility to Fifth Club, the jury is given wide latitude in performing its sworn duty to serve as fact finder in allocating responsibility. Tex. Civ. Prac. & Rem. Code Ann. § 33.003 (West Supp. 2004); *Rosell v. Central West Motor Stages, Inc.*, 89 S.W.3d 643, 659 (Tex. App.—Dallas 2002, no pet.). Even if the evidence could support a different percentage allocation of responsibility, an appellate court may not substitute its judgment for that of the jury. *Rosell*, 89 S.W.3d at 659. We conclude the evidence is legally and factually sufficient to support the jury's finding, and we overrule Fifth Club's and West's second issue.

*Issues 5 & 6: Malice Finding and Exemplary Damages*

Fifth Club challenges the jury's award of exemplary damages against Fifth Club and the jury's finding that both Fifth Club and West acted with malice. Here, Roberto's expert testified

---

[14] Roberto's expert testified that a background check would have revealed that West was violating Huston-Tillotson policies. The expert testified that had this check been made, Fifth Club should not have hired West. Fifth Club responds that it had no duty to perform a background check because it was hiring commissioned police officers. *See Hoechst Celanese Corp. v. Compton*, 899 S.W.2d 215, 227 (Tex. App.—Houston [14th Dist.] 1994, writ denied). *Hoechst* is easily distinguishable because it dealt with officers directing traffic, a function for which officers receive specialized training and which only peace officers could perform. *Id.* We agree with the district court's analysis that *Hoechst* is inapplicable here because many of the duties West performed—protecting Fifth Club's property, ejecting trespassers, and enforcing Fifth Club's rules and regulations—did not have to be performed by a peace officer.

23

that Fifth Club acted with gross negligence in hiring and retaining West. An employer can also be liable for exemplary damages due to the malicious acts of an employee if the employee was unfit and the corporation was grossly negligent in employing him. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998). We conclude the evidence was legally and factually sufficient to support an award of exemplary damages.

Fifth Club also argues that the amount of $35,000 in exemplary damages is excessive. Exemplary damages must be reasonably proportioned to actual damages. *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981). There is no set rule of ratio between the amount of actual and exemplary damages that will be considered reasonable. *Ethicon, Inc. v. Martinez*, 835 S.W.2d 826, 835 (Tex. App.—Austin 1992, writ denied). An award of exemplary damages rests largely in the discretion of the fact finder and will not be set aside as excessive unless the amount is so large as to indicate that it is the result of passion, prejudice, or corruption, or that the evidence has been disregarded. *Id.* Factors to consider when determining whether an exemplary-damages award is reasonable include: (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety. *Id.*

Here, the jury awarded over $110,000 in actual damages and $35,000 in exemplary damages. Examining the *Kraus* factors to determine whether this proportion is reasonable, we note first that the nature of the wrong consists of serious bodily injury inflicted by Fifth Club personnel to Roberto, who subsequently spent two days in jail for crimes for which he was later no-billed. We concluded above that the evidence is legally and factually sufficient to support the jury's findings

24

that Fifth Club is responsible for West's actions and that Fifth Club was itself grossly negligent. Second, Fifth Club delegated the hiring of security officers to a third party, failed to perform background checks, did not require applications to be completed, did not provide policy manuals or instructions to outside security personnel, and was not even aware of the identities of the security personnel it was employing. Moreover, there is evidence in the record that Club Rodeo's manager laughed at and mocked Laura while she was handcuffed. It is undisputed that West and Medrano were paid in full at the end of their shift and that Fifth Club took no action as a result of this incident. Third, regarding Fifth Club's culpability, the jury heard expert testimony that Fifth Club's conduct constituted gross negligence and proximately caused Roberto's injuries. Fourth, considering the situation and sensibilities of the parties concerned, we concluded that the evidence is legally and factually sufficient to support the conclusion that Roberto suffered, and continues to suffer from, injuries proximately caused by Fifth Club's gross negligence. Finally, Fifth Club's conduct offends a public sense of justice and propriety. Fifth Club representatives testified that personnel such as West were hired, in part, to protect its patrons. However, Fifth Club did nothing to ensure that the security personnel hired were qualified for employment. Furthermore, Fifth Club failed to inform its outside security personnel of club policies, as it did with other club employees. This is the type of conduct exemplary damages is meant to punish and deter. In light of the *Kraus* factors, the jury's award of exemplary damages equal to approximately one third the amount of actual damages is not clearly wrong and unjust. *See Kraus*, 616 S.W.2d at 910; *Martinez*, 835 S.W.2d at 835. We therefore overrule Fifth Club's exemplary-damages issue.

25

*Issues 3 & 4:  Award for Physical Pain, Mental Anguish, and Physical Impairment*

Fifth Club and West argue that the evidence is insufficient to support three awards: $80,000 for physical pain and mental anguish Roberto sustained in the past, $20,000 for mental anguish that he will reasonably sustain in the future, and $7,000 for physical impairment he suffered in the past.  Matters of past and future physical pain, mental anguish, and physical impairment are particularly within the jury's province.  *Marvelli v. Alston*, 100 S.W.3d 460, 482 (Tex. App.—Fort Worth 2003, pet. denied).  As long as sufficient probative evidence exists to support the jury's verdict, neither the reviewing court nor the trial court is entitled to substitute its judgment for that of the jury.  *Id.* (citing *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987)); *see also Rehabilitation Facility at Austin, Inc. v. Cooper*, 962 S.W.2d 151, 155 (Tex. App.—Austin 1998, no pet.).

Roberto presented evidence at trial that he suffered a fracture of his left zygomatic arch, a bone in his skull.  His face was swollen and bloody.  When he arrived at the jail after the incident, it was determined he needed to be taken to the hospital for treatment.  While in the hospital, he asked that his daughter not be allowed to see him in his condition.  He could not sleep or eat when in jail, was in pain, and had problems communicating following this incident.  Roberto had recurring headaches, required additional visits to the doctor, and missed a week of work.  We conclude the evidence is legally and factually sufficient to support an award for physical pain and mental anguish Roberto sustained in the past.

Roberto's wife testified that at the time of trial, over a year after the incident, Roberto continued to have trouble talking to people, was "always tossing and turning," and was having

26

nightmares. She testified he was eating less, suffering from depression, and pushing her away. We conclude the evidence is legally and factually sufficient to support an award for physical pain and mental anguish that Roberto will reasonably sustain in the future.

Physical impairment, sometimes called loss of enjoyment of life, encompasses the loss of the injured party's former lifestyle. *Dawson v. Briggs*, 107 S.W.3d 739, 752 (Tex. App.—Fort Worth 2003, no pet.). To recover damages for past impairment, the plaintiff must prove that the effect of his physical impairment extends beyond any impediment to his earning capacity and beyond any pain and suffering and mental anguish to the extent that it produces a separate and distinct loss that is substantial and for which he should be compensated. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003); *Blankenship v. Mirick*, 984 S.W.2d 771, 777 (Tex. App.—Waco 1999, pet. denied); *Lawson-Avila Constr., Inc. v. Stoutamire*, 791 S.W.2d 584, 599 (Tex. App.—San Antonio 1990, writ denied).

Here, Roberto suffered a fracture to a bone in his skull. He spent a week recovering from this injury, had difficulty eating and communicating with others, and sought to avoid his daughter so that she would not observe his condition. His wife testified that before the incident he used to exercise and eat frequently; after the incident he would not eat, had difficulty communicating, and would spend time in his room by himself. This represents more than a scintilla of evidence of physical impairment in the past, and we cannot say the jury's decision to award damages for physical impairment suffered in the past is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *See Crye*, 907 S.W.2d at 499; *Cain*, 709 S.W.2d at 176. Accordingly, the evidence is legally and factually sufficient to support the jury's award for

27

physical impairment in the past. Our review of the record also leads us to conclude that there is legally and factually sufficient evidence to support the amount of all damages the jury awarded.[15] We therefore overrule Fifth Club's and West's third and fourth issues.

## CONCLUSION

We have overruled Laura's and Adolfo's one issue on appeal, and Fifth Club's and West's seven issues. The final judgment of the district court is therefore affirmed.

_____

Mack Kidd, Justice

Before Justices Kidd, Puryear and Pemberton

Affirmed

Filed:   April 29, 2004

---

[15] The award of $80,000 was for both physical pain *and* mental anguish in the past; we note that Fifth Club and West do not address the validity of the award for physical pain.