IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-05-00212-CV

 

Durham Transportation Company, INC.,

 

                                                                      Appellant

v.

 

Tina and charles Beettner, individually and 

as next friends of michael aaron beettner,

a minor; sylvia whiddon-cervantes, individually 

and as next friend of samantha whiddon, a 

minor; and elisabeth thomas, individually 

and as next friend of nicole thomas, a minor,

 

                                                                      Appellees

 

 

 



From the 249th District Court

Johnson County, Texas

Trial Court No. 249-270-98

 



Opinion



 








          The parents of three children filed
suit against Durham Transportation Company for injuries the children sustained
in a school bus accident.  A jury found in Appellees’ favor and awarded
damages.  After trial, the court determined that the current prejudgment and
postjudgment interest statutes are unconstitutional, retroactive laws as applied
to Appellees because these statutes took effect during the pendency of Appellees’
suit.  

          Durham contends in seven issues that:

(1)              
the court erred by
submitting each of the Appellees’ damages questions in broad form because there
is no evidence to support one or more of the elements of each Appellee’s
damages claims;

 

(2)              
the evidence is factually
insufficient to support certain elements of the Appellees’ damages claims;

 

(3)              
the court erred by declaring
the prejudgment and postjudgment interest statutes unconstitutional;

 

(4)              
the court erred by awarding
attorney’s fees because no evidence was presented to the jury on this issue and
no question was submitted to the jury on the issue;

 

(5)              
the court erred by awarding
attorney’s fees for a declaratory relief claim which was asserted solely as a
vehicle to obtain attorney’s fees;

 

(6)              
the court erred by granting Appellees’
no-evidence summary judgment motion on an issue on which the Appellees had the
burden of proof (constitutionality of prejudgment and postjudgment interest
statutes); and

 

(7)              
the court erred by awarding
prejudgment interest on costs and attorney’s fees.

 

We will affirm in part, reverse and render in
part, and suggest a remittitur.

BROAD-FORM SUBMISSION

          Durham contends in its first issue
that the court erred by submitting each of the Appellees’ damages questions in
broad form because there is no evidence to support one or more of the elements
of each Appellee’s damages claims.  With respect to the Beettners’ and
Whiddons’ damages, Durham contends that there is no evidence of past or future
physical impairment or lost earning capacity.[1] 
With respect to the Thomases’ damages, Durham contends there is no evidence of
past physical impairment, lost earning capacity, or future disfigurement.

          A trial court errs by submitting a
broad-form damages question which includes elements of damages for which there
is no evidence.  Romero v. KPH Consolidation, Inc., 166 S.W.3d 212,
226-27 (Tex. 2005); Harris County v. Smith, 96 S.W.3d 230, 233-34
(Tex. 2002).  To resolve Durham’s first issue then, we must determine whether,
as Durham contends, there is no evidence to support the challenged damages
elements.  See Romero, 166 S.W.3d at 220-24.

          When we conduct a no-evidence review,
we must determine “whether the evidence at trial would enable reasonable and
fair-minded people to reach the verdict under review.”  City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  We “must credit favorable evidence
if reasonable jurors could, and disregard contrary evidence unless reasonable
jurors could not.”  Id.

          The elements of damages at issue here
are past and future physical impairment, future lost earning capacity, and
future disfigurement.  We address each of these in turn.

          “[P]hysical impairment must be
substantial and extend beyond any pain, suffering, mental anguish, lost wages
or diminished earning capacity.”  Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 772 (Tex. 2003).  A broad range of limitations on physical
activities have been upheld as compensable physical impairments.  See
Patlyek v. Brittain, 149 S.W.3d 781, 787 (Tex. App.—Austin 2004, pet.
denied).

Examples of injuries or limitations that have
been held to be legally sufficient evidence of physical impairment include
difficulty eating and communicating with others; continuing inability to sleep
due to sharp pains, plus inability to run, bicycle, participate in triathlons,
and play with children; past inability to walk and future difficulties in running,
standing, and climbing; inability to ascend or descend stairs or kneel and
difficulty in standing for long periods of time; loss of seventy-five percent
of strength in left arm, which subsequently contributed to plaintiff’s falling,
breaking her leg, and being confined to a wheelchair; and difficulties
performing yard work, car maintenance, and playing racquetball.

 

Id.
(citations omitted).

          “Lost earning capacity concerns the
impairment to one’s ability to work.”  Clayton v. Wisener, 190 S.W.3d 685,
697 (Tex. App.—Tyler 2005, pet. denied) (quoting Koko Motel, Inc. v. Mayo,
91 S.W.3d 41, 51 (Tex. App.—Amarillo 2002, pet. denied)).   This element of
damages measures the extent to which a plaintiff’s pre-injury capacity to work
was impaired by the injury.  See Tagle v. Galvan, 155 S.W.3d 510, 519-20
(Tex. App.—San Antonio 2004, no pet.); Plainview Motels, Inc. v. Reynolds,
127 S.W.3d 21, 35-36 (Tex. App.—Tyler 2003, pet. denied).

          To support an award of damages for
lost earning capacity, a plaintiff must present evidence sufficient to permit a
jury “to reasonably measure earning capacity in monetary terms.”  Tagle,
155 S.W.3d at 519; Plainview Motels, 127 S.W.3d at 35-36.  However,
courts recognize that any determination of future earning capacity involves an
element of uncertainty.  See McIver v. Gloria, 140 Tex. 566, 169 S.W.2d 710,
712 (1943); Tagle, 155 S.W.3d at 519; Plainview Motels, 127
S.W.3d at 35; Koko Motel, 91 S.W.3d at 51.  Thus, juries are accorded
considerable discretion in making such determinations.  Id. 
Nonetheless, a jury’s award of damages for lost earning capacity “must be based
on something more than mere conjecture.”  McIver, 169 S.W.2d at 712; accord
Clayton, 190 S.W.3d at 697-98; Koko Motel, 91 S.W.3d at 51.

          Non-exclusive factors which may be considered
in determining lost earning capacity include “evidence of past earnings; the
plaintiff’s stamina, efficiency, and ability to work with pain; the weaknesses
and degenerative changes that will naturally result from the plaintiff’s
injury; and the plaintiff’s work-life expectancy.”  Tagle, 155 S.W.3d at
519; Plainview Motels, 127 S.W.3d at 36; accord Koko Motel, 91
S.W.3d at 52.  However, each case must be determined according to its
particular facts and circumstances.  See McIver, 169 S.W.2d at 712; Clayton,
190 S.W.3d at 698; Koko Motel, 91 S.W.3d at 51.

          “Where plaintiff is a child, who has
never earned any money, the jury must determine the value of its lost earning
capacity altogether from their common knowledge and sense of justice.”  McIver,
169 S.W.2d at 712; Pilgrim’s Pride Corp. v. Smoak, 134 S.W.3d 880, 903
(Tex. App.—Texarkana 2004, pet. denied); accord Strauss v. Continental
Airlines, Inc., 67 S.W.3d 428, 436 (Tex. App.—Houston [14th Dist.] 2002, no
pet.); Pipgras v. Hart, 832 S.W.2d 360, 366 (Tex. App.—Fort Worth 1992,
writ denied); C.T.W. v. B.C.G., 809 S.W.2d 788, 794 (Tex. App.—Beaumont
1991, no writ).

          Disfigurement is “that which impairs
or injures the beauty, symmetry, or appearance of a person or thing; that which
renders unsightly, misshapen or imperfect, or deforms in some manner.”  Goldman
v. Torres, 161 Tex. 437, 341 S.W.2d 154, 160 (1960); accord Doctor v.
Pardue, 186 S.W.3d 4, 18 (Tex. App.—Houston [1st Dist.] 2005, pet. filed); SunBridge
Healthcare Corp. v. Penny, 160 S.W.3d 230, 252 (Tex. App.—Texarkana 2005,
no pet.); Schindler Elevator Corp. v. Anderson, 78 S.W.3d 392, 413 (Tex.
App.—Houston [14th Dist.] 2001, pet. granted, judgm’t vacated w.r.m.).

Michael Beettner

          Durham contends that the record
contains no evidence that Michael Beettner suffered past or future physical
impairment or lost earning capacity.

          Beettner testified that the accident
caused him to suffer torn fibers on the lateral side of his left kneecap. 
Medical records admitted in evidence support this diagnosis.  Immediately after
the accident, his knee “hurt bad,” and he experienced pain when walking.  A
knee brace provided by the hospital helped with the pain by preventing him from
fully extending his leg.  Beettner experienced this pain and discomfort for “about
a month to a month and a half.”  After that, he experienced “very slight pain.”

          Nevertheless, Beettner was still
experiencing problems with his knee at the time of trial, five and one-half
years after the accident.  Beettner testified that

[a]bout every month, two to three times a month
it will catch, the kneecap part will catch and pop.  And at first, for about
five minutes, it’s very painful, and then after that, it’s pretty much fine,
but it depends on how much the weather changes as to how much it does in the
month.

 

          Because of the knee injury, Beettner
decreased his participation in athletics.  Before the accident, he participated
in football, baseball, basketball, and track.  Afterward, he played only
baseball because of the pain associated with his knee.

          The jury awarded the Beettners $3,000
in damages for physical pain, mental anguish, and physical impairment suffered
in the past.  The jury awarded them $25,000 in damages for physical pain,
mental anguish, physical impairment, and lost earning capacity which Beettner
will suffer in the future.

          Beettner’s testimony that (1) the
injury has caused him to experience pain while walking, (2) the injury has
caused him to decrease his participation in athletics, and (3) his symptoms
have continued constitutes evidence which “would enable reasonable and
fair-minded people” to award damages for past and future physical impairment.  See
Patlyek, 149 S.W.3d at 787-88; Plainview Motels, 127 S.W.3d at 39; Schindler
Elevator Corp., 78 S.W.3d at 412.

          With regard to lost earning capacity, Beettner
contends that his testimony regarding the pain he frequently experiences while
walking provided a sufficient basis for the jury to award damages for lost
earning capacity.  Durham counters that this constitutes “no evidence” because
Beettner has not missed any work because of his injury, because the injury has
not affected his grades, and because he has continued to play baseball since
suffering the injury.  However, these contentions go to the factual sufficiency
of the evidence rather than the question of whether the Beettners produced
“some evidence” of lost earning capacity.

          Appellate courts have affirmed damages
awarded for lost earning capacity where the plaintiff suffered a knee injury or
some other injury which affected the plaintiff’s ability to walk.  See,
e.g., Allright, Inc. v. Van Scoyoc, 784 S.W.2d 942, 945 (Tex. App.—Houston [14th Dist.] 1990, no writ); Mo. Pac. R.R. Co. v. Schreck, 774 S.W.2d 687,
689-90 (Tex. App.—Texarkana 1989, no writ); Padget v. Gray, 727 S.W.2d 706,
712 (Tex. App.—Amarillo 1987, no writ).  The jury heard Beettner’s testimony
about how his knee injury affected his ability to walk.  It was for the jurors
to apply “their common knowledge and sense of justice” to determine the amount
of damages the Beettners should be awarded for lost earning capacity.  See
McIver, 169 S.W.2d at 712; Pipgras, 832 S.W.2d at 366; C.T.W.,
809 S.W.2d at 794.

          Beettner’s testimony about the pain he
experiences while walking is evidence which “would enable reasonable and
fair-minded people” to award damages for lost earning capacity.  See
Allright, 784 S.W.2d at 945; Mo. Pac. R.R., 774 S.W.2d at
689-90; Padget, 727 S.W.2d at 712.

Samantha Whiddon

          Durham contends that the record
contains no evidence that Samantha Whiddon suffered past or future physical
impairment or lost earning capacity.

          Whiddon testified that, because of a
tongue injury she suffered in the accident, her ability to speak has been
impaired.[2] 
“[I]f I try to speak too quickly . . . I have to repeat myself and people can’t
understand me . . . .”  Her mother likewise testified that Whiddon talks
differently now and “if she talks fast, you can’t understand her sometimes.”

          The jury awarded the Whiddons $3,000
in damages for physical pain, mental anguish, and physical impairment suffered
in the past.  The jury awarded them $25,000 in damages for physical pain,
mental anguish, physical impairment, and lost earning capacity which Whiddon
will suffer in the future.

          Appellate courts have affirmed damages
awarded for physical impairment where the plaintiff suffered an injury which
affected the plaintiff’s ability to speak or communicate.  See Ramirez v.
Fifth Club, Inc., 144 S.W.3d 574, 592 (Tex. App.—Austin 2004), rev’d in
part on other grounds, 49 Tex. Sup. Ct. J. 863, 2006 Tex. LEXIS 638 (Tex. June 30, 2006);[3] Roberts
v. Williamson, 52 S.W.3d 343, 350-51 (Tex. App.—Texarkana 2001), rev’d
in part on other grounds, 111 S.W.3d 113 (Tex. 2003);[4]
see also SunBridge Healthcare, 160 S.W.3d at 253 (suggesting remittitur
from $497,000 to $150,000 for physical impairment award because of limited
duration of impairment).

          Thus, the evidence that Whiddon’s
ability to speak has been impaired by her tongue injury is evidence which “would
enable reasonable and fair-minded people” to award damages for physical
impairment.  Id.

          It goes without saying that an
inability to speak or communicate clearly can impact a person’s suitability for
employment.  Thus, appellate courts have held that damages for loss of earning
capacity may be recovered where the plaintiff suffered an injury which affected
the plaintiff’s ability to speak or communicate.  See, e.g., Roberts, 52
S.W.3d at 350-51; Farley v. M. M. Cattle Co., 549 S.W.2d 453, 459-60
(Tex. Civ. App.—Waco 1977, writ ref’d n.r.e.). 

          The jury heard the testimony about how
Whiddon’s tongue injury affected her ability to speak.  It was for the jurors
to apply “their common knowledge and sense of justice” to determine the amount
of damages the Whiddons should be awarded for lost earning capacity.  See
McIver, 169 S.W.2d at 712; Pipgras, 832 S.W.2d at 366; C.T.W.,
809 S.W.2d at 794.  Therefore, the testimony about Whiddon’s impaired ability
to speak is evidence which “would enable reasonable and fair-minded people” to
award damages for lost earning capacity.  See Roberts, 52 S.W.3d at
350-51; Farley, 549 S.W.2d at 459-60.

Nicole Thomas

          Durham contends that the record
contains no evidence that Nicole Thomas suffered past physical impairment, lost
earning capacity, or future disfigurement.

          Thomas testified that she experienced
back, neck, and shoulder pain as a result of the accident.  The neck and
shoulder pain subsided, but the back pain has continued.  Thomas testified that
her back pain has worsened each year.  When she sits for more than ten minutes
at a time without moving, she experiences numbness and pain, which sometimes
becomes “unbearable.”  According to an orthopedic clinic report made about a
year after the accident, Thomas complained at that time that “[s]he used to
play basketball, volleyball, and run track (hurdles).  These now cause her
pain, although she has played basketball since the accident.”

          An orthopedic surgeon testified that
Thomas has a “bilateral pars defect” exacerbated by spondylolisthesis in the L5
region.  The surgeon could not say whether this pars defect existed before the
accident, but the surgeon did opine that Thomas suffered a lower back injury in
this region which caused the symptoms she is now experiencing.[5] 
The surgeon recommends that Thomas undergo a lumbosacral fusion to treat these
symptoms.

          The jury awarded the Thomases $25,000
in damages for physical pain, mental anguish, and physical impairment suffered
in the past.  The jury awarded them $425,000 in damages for physical pain,
mental anguish, physical impairment, and lost earning capacity which Thomas
will suffer in the future.

          The evidence that Thomas’s back injury
has caused her to experience pain while participating in athletics is evidence
which “would enable reasonable and fair-minded people” to award damages for
past and future physical impairment.  See Plainview Motels, 127 S.W.3d at
39; Harris County v. Smith, 66 S.W.3d 326, 331-32 (Tex. App.—Houston [1st Dist.] 2001), rev’d on other grounds, 96 S.W.3d 230 (Tex. 2002); Molina v. Moore, 33 S.W.3d 323, 329 (Tex. App.—Amarillo 2000, no pet.); Lawson-Avila
Constr., Inc. v. Stoutamire, 791 S.W.2d 584, 599-600 (Tex. App.—San Antonio
1990, writ denied).

          Appellate courts have affirmed damages
awarded for lost earning capacity where the plaintiff suffered a back injury
which continued to cause pain, numbness, and other symptoms.  See Pilgrim’s
Pride Corp., 134 S.W.3d at 904; Strahan v. Davis, 872 S.W.2d 828,
833 (Tex. App.—Waco 1994, writ denied); Tri-State Motor Transit Co. v. Nicar,
765 S.W.2d 486, 492-93 (Tex. App.—Houston [14th Dist.] 1989, no writ).  The
jury heard the evidence about how Whiddon’s back injury has affected her.  It
was for the jurors to apply “their common knowledge and sense of justice” to
determine the amount of damages the Thomases should be awarded for lost earning
capacity.  See McIver, 169 S.W.2d at 712; Pipgras, 832 S.W.2d at
366; C.T.W., 809 S.W.2d at 794.  Therefore, the testimony about Thomas’s
back injury and numbness is evidence which “would enable reasonable and
fair-minded people” to award damages for lost earning capacity.  See
Pilgrim’s Pride Corp., 134 S.W.3d at 904; Strahan, 872 S.W.2d at
833; Tri-State Motor Transit Co., 765 S.W.2d at 492-93.

          Appellate courts have affirmed damages
awarded for physical disfigurement where the plaintiff has suffered or will
suffer scarring from surgery performed as a result of the injuries at issue.  See,
e.g., Tesfa v. Stewart, 135 S.W.3d 272, 276-77 (Tex. App.—Fort Worth 2004,
pet. denied); Wal-Mart Stores, Inc. v. Tinsley, 998 S.W.2d 664, 673
(Tex. App.—Texarkana 1999, pet. denied); Nw. Mall, Inc. v. Lubri-Lon Int’l,
Inc., 681 S.W.2d 797, 804 (Tex. App.—Houston [14th Dist.] 1984, writ ref’d
n.r.e.).  Therefore, the orthopedic surgeon’s testimony that Thomas will
require back surgery is evidence which “would enable reasonable and fair-minded
people” to award damages for future disfigurement.  Id.

Summary

          The record contains sufficient
evidence which “would enable reasonable and fair-minded people” to award
damages for each of the elements Durham challenges in its first issue.  Thus,
the court did not err by submitting a broad-form damages question for each
plaintiff.  Cf. Romero, 166 S.W.3d at 226-27; Smith, 96 S.W.3d at
233-34.  Accordingly, we overrule Durham’s first issue.

FACTUAL SUFFICIENCY

          Durham contends in its second issue
that the evidence is factually insufficient to support the jury’s award of
damages for each of the elements challenged in Durham’s first issue and for the
jury’s award of past medical expenses.

          “Under traditional factual sufficiency
standards, a court determines if a finding is so against the great weight and
preponderance of the evidence that it is manifestly unjust, shocks the
conscience, or clearly demonstrates bias.”  In re C.H., 89 S.W.3d 17, 25
(Tex. 2002).

Michael Beettner

          Durham contends that there is
factually insufficient evidence that Beettner suffered past or future physical
impairment or lost earning capacity.  Durham also contends that the jury’s
award of $500 for past medical expenses is excessive.

          Durham argues that the evidence is
factually insufficient on the elements of past and future physical impairment
and lost earning capacity because there is evidence that: (1) Beettner was
having no trouble with the mechanics of his knee and no swelling or instability
nine days after the accident when he had his initial visit with an orthopedic
surgeon; (2) Beettner had broken nine bones before this accident and has a high
tolerance for pain; (3) Beettner is not taking pain medication for his knee; (4)
the knee injury did not affect his grades or his ability to play high school
baseball; and (5) the knee injury has not affected his plans to attend
community college and has not caused him to miss work.

          However, in light of Beettner’s
testimony that (1) the injury has caused him to experience pain while walking,
(2) the injury has caused him to decrease his participation in athletics, and
(3) his symptoms have continued, we hold that the evidence is factually
sufficient to support the jury’s award of damages for past and future physical
impairment.  See Plainview Motels, 127 S.W.3d at 39; Schindler
Elevator Corp., 78 S.W.3d at 412.

          In light of Beettner’s testimony that
he frequently experiences pain while walking, we hold that the evidence is factually
sufficient to support the jury’s award of damages for lost earning capacity.  Allright,
784 S.W.2d at 945; Mo. Pac. R.R., 774 S.W.2d at 689-90; Padget,
727 S.W.2d at 712; see also Pipgras, 832 S.W.2d at 366; C.T.W.,
809 S.W.2d at 794.

          Durham contends that the jury’s award
of $500 for past medical expenses is excessive because the only evidence
admitted with regard to Beettner’s medical expenses consisted of: (1) an
affidavit of $195 in expenses for an orthopedic surgeon; and (2) the parties’
stipulation that “there are no other past medical bills for Michael Beettner
for emergency room treatment other than the two stipulated amounts of $25 and
$88.”[6]

          Beettner also offered an affidavit
from a records custodian that the billing records from his emergency room visit
were “voided.”  Beettner argues on appeal that the jury could look to Turner’s
emergency room bills and infer that he would have had an ER physician charge
“of about $215,” which is the amount Turner was billed by her ER physician.[7] 
However, this argument ignores the binding effect of the parties’ stipulation.

          “A stipulation is ‘an agreement,
admission, or concession made in a judicial proceeding by the parties or their
attorneys respecting some matter incident thereto.’”  Shepherd v. Ledford,
962 S.W.2d 28, 33 (Tex. 1998) (quoting Ortega-Carter v. Am. Int’l Adjustment
Co., 834 S.W.2d 439, 441-42 (Tex. App.—Dallas 1992, writ denied)); Travelers
Indem. Co. v. Starkey, 157 S.W.3d 899, 903-04 (Tex. App.—Dallas 2005, pet.
denied).  Under Rule of Civil Procedure 11, a stipulation is enforceable if it
is in writing, signed, and filed as part of the record, or made in open court
and entered of record.  See Tex.
R. Civ. P. 11; Travelers Indem. Co., 157 S.W.3d at 904.  A
stipulation is binding on the parties and the court.  See Shepherd, 962
S.W.2d at 33; Travelers Indem. Co., 157 S.W.3d at 904; Houston
Lighting & Power Co. v. City of Wharton, 101 S.W.3d 633, 641 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).

          Beettner stipulated on the record that
his only costs “for emergency room treatment” amounted to $113.  He cannot now
contend that the jury could look to Turner’s medical records as evidence of how
much he was charged by the ER physician.  Id.  Therefore, the evidence
is factually insufficient to support the jury’s award to the Beettners of $500
for past medical expenses.  Accordingly, we will suggest a remittitur of $192. See Tex. R. App. P. 46.3; Torrington Co.
v. Stutzman, 46 S.W.3d 829, 851 (Tex. 2000); Burke v. Union Pac. Res.
Co., 138 S.W.3d 46, 72 (Tex. App.--Texarkana 2004, pet. denied).

Samantha Whiddon

          Durham contends that there is
factually insufficient evidence that Whiddon suffered past or future physical
impairment or lost earning capacity.  Durham also contends that the jury’s
award of $3,000 for past medical and dental expenses is excessive.

          Durham argues that the evidence is
factually insufficient on the elements of past and future physical impairment
and lost earning capacity because there is evidence that Whiddon: (1) has
maintained straight-A’s in school; (2) is taking night courses at a community
college; (3) is on the swim team and student council; and (4) has been
coordinating youth activities at her church.  However, in light of the
testimony from Whiddon and her mother about Whiddon’s impaired ability to
speak, we hold that the evidence is factually sufficient to support the jury’s
award of damages for past and future physical impairment.  See SunBridge
Healthcare, 160 S.W.3d at 253; Ramirez, 144 S.W.3d at 592; Roberts,
52 S.W.3d at 350-51.  We likewise hold that the evidence is factually
sufficient to support the jury’s award of damages for lost earning capacity.  See
Roberts, 52 S.W.3d at 350-51; Farley, 549 S.W.2d at 459-60; see
also Pipgras, 832 S.W.2d at 366; C.T.W., 809 S.W.2d at 794.

          Durham contends that the jury’s award
of $3,000 for past medical and dental expenses is excessive because the only
evidence admitted with regard to Whiddon’s expenses consisted of medical
expense affidavits of: (1) $348 for ambulance services; (2) $532 for emergency
room services; (3) $191 for dental services (Oct. to Nov. 1998); (4) $70 for
dental services (July 1999); (5) $1,379[8]
for dental services (Apr. to May 2003).  Whiddon also offered in evidence two
receipts totaling $11.53 for medicines.  This evidence accounts for $2,531.53
in medical and dental expenses.

          Nevertheless, Whiddon responds that
the evidence shows that her actual expenses exceeded the $3,000 award because a
dentist, Dr. Hall, testified that he bonded her two injured teeth for $70 in
July 1999 and these teeth would require re-bonding every two years.  However,
Dr. Hall also testified that another dentist, Dr. Chuoke, re-bonded Whiddon’s
teeth in 2003.  Dr. Chuoke’s charges for this procedure are included within the
$1,379 charged for dental services from April to May 2003 as indicated above. 
There is no evidence in the record that Whiddon’s teeth were re-bonded in 2001
or on any other occasion before the January 2004 trial.

          Therefore, the evidence is factually
insufficient to support the jury’s award to the Whiddons of $3,000 for past
medical expenses.  Accordingly, we will suggest a remittitur of $468.47. See
Tex. R. App. P. 46.3; Torrington
Co., 46 S.W.3d at 851; Burke, 138 S.W.3d at 72.

Nicole Thomas

          Durham contends that there is
factually insufficient evidence that Thomas suffered past physical impairment,
lost earning capacity, or future disfigurement.  Durham also contends that the
jury’s award of $10,000 for past medical expenses is excessive.

          Durham argues that the evidence is
factually insufficient on the element of past physical impairment and lost
earning capacity because Thomas testified that she was able to play volleyball
and basketball after sitting out for a year without “aggravating” her back
injury or making it worse.  However, in light of Thomas’s testimony that her
back injury has caused her to experience pain while participating in athletics,
that her back pain has worsened, and that she is experiencing numbness in her
leg, we hold that the evidence is factually sufficient to support the jury’s
award of damages for past physical impairment.  See Plainview Motels,
127 S.W.3d at 39; Smith, 66 S.W.3d at 331-32; Molina, 33 S.W.3d at
329; Lawson-Avila Constr., 791 S.W.2d at 599-600.

          We likewise hold that the evidence is
factually sufficient to support the jury’s award of damages for lost earning
capacity.  See Pilgrim’s Pride Corp., 134 S.W.3d at 904; Strahan,
872 S.W.2d at 833; Tri-State Motor Transit Co., 765 S.W.2d at 492-93; see
also Pipgras, 832 S.W.2d at 366; C.T.W., 809 S.W.2d at 794.

          With regard to the Thomases’ claim for
damages for future disfigurement, Durham argues only that the evidence is
factually insufficient because the orthopedic surgeon’s testimony is conclusory
on its face.  However, we have already rejected this argument.  Based on the
surgeon’s testimony that Thomas will require a lumbosacral fusion, we hold that
the evidence is factually sufficient to support the jury’s award of damages for
future disfigurement.  See Wal-Mart Stores, 998 S.W.2d at 673; Nw.
Mall, 681 S.W.2d at 804.

          Durham contends that the jury’s award
of $10,000 for past medical expenses is excessive because the evidence supports
an award for only $4,094.  However, the documentary evidence admitted shows
that the Thomases incurred the following expenses: (1) $125 for pediatrician;
(2) $3,019 for orthopedic services; (3) $600 for a CT scan; (4) $348 for
emergency room treatment; (5) $362 for neurologist; (6) $387 for ambulance;[9]
and (7) $215 for ER physician.  This evidence amounts to $5,056 in past medical
expenses.

          Durham does not challenge any of the
listed evidence as not being part of the Thomases’s reasonable and necessary
medical costs.  Thomas concedes that a remittitur of $4,944 is warranted. 
Therefore, because the evidence is factually insufficient to support the jury’s
award to Thomas of $10,000 for past medical expenses, we will suggest a remittitur of $4,944. See Tex. R. App. P. 46.3; Torrington Co.,
46 S.W.3d at 851; Burke, 138 S.W.3d at 72.

Summary

          The record contains factually
sufficient evidence to support the jury’s award of damages to the Beettners and
the Whiddons for past and future physical impairment and for lost earning capacity. 
The record likewise contains factually sufficient evidence to support the
jury’s award of damages to the Thomases for past physical impairment, lost
earning capacity, and future disfigurement.

          However, the evidence is factually
insufficient to support the damages awarded for past medical expenses. 
Therefore, we will suggest a remittitur of $192 for the Beettners’ past medical
expenses; we will suggest a remittitur of $468.47 for the Whiddons’ past
medical expenses; and we will suggest a remittitur of $4,944 for the Thomases’ past medical expenses.  Accordingly, we
sustain Durham’s second issue in part and overrule it in part.

ATTORNEY’S FEES

          Durham contends in its fourth issue
that the court abused its discretion by awarding attorney’s fees to Appellees
because they failed to plead and prove a claim for attorney’s fees to the
jury.  Durham contends in its fifth issue that the court abused its discretion
by awarding attorney’s fees under the Uniform Declaratory Judgments Act because
Appellees pursued a post-trial claim for declaratory relief solely as a basis
for obtaining attorney’s fees.

          The Uniform Declaratory Judgments Act
provides in pertinent part:

          A person . . . whose rights, status,
or other legal relations are affected by a statute, municipal ordinance,
contract, or franchise may have determined any question of construction or
validity arising under the . . .  statute, ordinance, contract, or franchise
and obtain a declaration of rights, status, or other legal relations thereunder.

 

Tex. Civ.
Prac. & Rem. Code Ann.
§ 37.004(a) (Vernon 1997).  Thus, the constitutionality of a statute may be
challenged under this Act.  See, e.g., Neeley v. W. Orange-Cove Consol.
Indep. Sch. Dist., 176 S.W.3d 746 (Tex. 2005).  Reasonable and necessary
attorney’s fees may be recovered in suits brought under this Act.  See Tex. Civ. Prac. & Rem. Code Ann. § 37.009
(Vernon 1997).

          However, “[t]here is no
basis for declaratory relief if the party seeking such relief is already
seeking a different, enforceable remedy, and a judicial declaration would add
nothing to what would be implicit or express in a final judgment for the
enforceable remedy” already being sought.  Strayhorn v. Raytheon E-Sys.,
Inc., 101 S.W.3d 558, 572 (Tex. App.—Austin 2003, pet. denied) (quoting Universal
Printing Co. v. Premier Victorian Homes, Inc., 73 S.W.3d 283, 296 (Tex.
App.—Houston [1st Dist.] 2001, pet. denied)); accord U.S. Bank v. Prestige
Ford Garland Ltd. P’ship, 170 S.W.3d 272, 278 (Tex. App.—Dallas 2005, no
pet.).  Thus, it is an abuse of discretion to award attorney’s fees under the
Uniform Declaratory Judgments Act if the claim for declaratory relief is urged
solely as a vehicle to obtain attorney’s fees.  See U.S. Bank, 170
S.W.3d at 278; Raytheon E-Sys., 101 S.W.3d at 572.

          Here, Appellees urged a
claim for declaratory relief to determine whether the current prejudgment and
postjudgment interest statutes are retroactive laws which cannot be
constitutionally applied in their case.  However, Appellees’ constitutional
claims could have easily been raised under their prior pleadings in conjunction
with their request for prejudgment and postjudgment interest and without the
necessity of a separate claim for declaratory relief.  See, e.g., In re
B.R.S., 166 S.W.3d 373, 374 (Tex. App.—Waco 2005, no pet.); In re N.A.S.,
100 S.W.3d 670, 671 (Tex. App.—Dallas 2003, no pet.); Willard v. Davis,
881 S.W.2d 907, 910 (Tex. App.—Fort Worth 1994, orig. proceeding).  Therefore,
we conclude that Appellees urged their claim for declaratory relief solely as a
vehicle to obtain attorney’s fees.  See U.S. Bank, 170 S.W.3d at 278; Raytheon
E-Sys., 101 S.W.3d at 572.

          For this reason, the court
abused its discretion by awarding Appellees attorney’s fees under the Uniform
Declaratory Judgments Act.  Id.  Attorney’s fees are not recoverable in
a personal injury suit premised on negligence.  See Gulf States Utils. Co. v. Low, 79 S.W.3d 561, 568 (Tex. 2002); City of Houston v. Woods, 138 S.W.3d 574, 582-83 (Tex. App.—Houston [14th Dist.] 2004, no
pet.).  Appellees assert no other legal basis to support the trial court’s
award of attorney’s fees.

          Therefore, the court abused
its discretion by awarding attorney’s fees to Appellees.  Accordingly, we
sustain Durham’s fourth and fifth issues.

RETROACTIVE LAWS

          Durham contends in its
third issue that the court erred by declaring the prejudgment and postjudgment
interest statutes to be unconstitutional retroactive laws as applied in
Appellees’ case.  The trial court declared these statutes unconstitutional
insofar as section 304.1045 of the Finance Code now prohibits the award of
prejudgment interest on future damages and section 304.003 has been amended so
that the current rate of interest for a judgment has been reduced from ten
percent to five percent per annum.

          In 1998 when the accident
occurred, section 304.102 of the Finance Code provided, “A judgment in a
wrongful death, personal injury, or property damage case must include
prejudgment interest.”  Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 1,
sec. 304.102, 1997 Tex. Gen. Laws 3091, 3435 (amended 1999) (current version at
Tex. Fin. Code Ann. § 304.102 (Vernon Supp. 2005)).[10] 
Under section 304.102 and its predecessor, courts held that prejudgment
interest was recoverable on future damages.  See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 530 (Tex. 1998); Brookshire
Grocery Co. v. Smith, 99 S.W.3d 819, 825 (Tex. App.—Beaumont 2003, pet.
denied); Reliable Consultants, Inc. v. Jaquez, 25 S.W.3d 336, 347 (Tex.
App.—Austin 2000, pet. denied).

          In 2003 however, the
Legislature effectively overruled these decisions by enacting section 304.1045
of the Finance Code which provides, “Prejudgment interest may not be assessed
or recovered on an award of future damages.”  Tex.
Fin. Code Ann. § 304.1045 (Vernon Supp. 2005).  Section 304.1045 applies
to “any case in which a final judgment is signed or subject to appeal on or
after the effective date of this Act.”  Act of June 2, 2003, 78th Leg., R.S.,
ch. 204, § 6.04, 2003 Tex. Gen. Laws 847, 862.  The effective date of the
statute was September 1, 2003.  Id. § 23.02(a), 2003 Tex. Gen. Laws 847,
898.  The judgment in this case was not signed until January 6, 2005.

          The postjudgment interest
rate in 1998 was ten percent per annum.[11] 
See Act of May 24, 1997, 75th Leg., R.S., ch. 1008, § 1, sec.
304.003(c)(2), 1997 Tex. Gen. Laws 3091, 3435 (amended 2003) (current version
at Tex. Fin. Code Ann. § 304.003(c)(2)
(Vernon Supp. 2005)).  The 2003 amendment to section 304.003(c) halved the applicable
rate so that judgments now bear interest at the rate of five percent per annum.[12]  See Tex. Fin. Code Ann. § 304.003(c)(2).  This amendment took
effect on September 1, 2003.  See Act of June 2, 2003, 78th Leg., R.S.,
ch. 204, § 23.02(a), 2003 Tex. Gen. Laws 847, 898.

          Article I, section 16 of
the Texas Constitution provides, “No bill of attainder, ex post facto law,
retroactive law, or any law impairing the obligation of contracts, shall be
made.”  Tex. Const. art. I, § 16. 
A statute violates the “retroactive law” prohibition of article I, section 16
if it “operate[s] retroactively to deprive or impair vested substantive rights
acquired under existing laws, or create[s] new obligations, impose[s] new
duties, or adopt[s] new disabilities in respect to transactions or
considerations past.”  In re J.B.W., 99 S.W.3d 218, 223 (Tex. App.—Fort Worth 2003, pet. denied) (quoting In re Tex. Dep’t of Protective &
Regulatory Servs., 71 S.W.3d 446, 450 (Tex. App.—Fort Worth 2002, orig.
proceeding) (per curiam));[13] accord
Price Pfister, Inc. v. Moore & Kimmey, Inc., 48 S.W.3d 341, 353 (Tex.
App.—Houston [14th Dist.] 2001, pet. denied).

          A “vested right” implies an immediate
right or entitlement—it is not an expectation or a contingency.  “When the
authority granting the right has the power and discretion to take that right
away, it cannot be said to be a vested right.”  Engrained in the concept of
vested rights is the idea of certainty.  When a lawmaking power can declare
that a right does not exist, the right is not “fixed or vested.”  Further, the
triggering date of a vested right must be readily ascertainable.  The filing of
a lawsuit in order to obtain relief or pursue a remedy is generally held not to
create or destroy vested rights; the triggering event for the vesting of a
right is the resolution of the controversy and the final determination—not the
filing of the suit.

 

Houston Indep. Sch. Dist. v. Houston Chronicle Publ’g
Co., 798 S.W.2d 580,
589 (Tex. App.—Houston [1st Dist.] 1990, writ denied) (quoting Ex parte
Abell, 613 S.W.2d 255, 262  (Tex. 1981) (orig. proceeding)) (citing McCain
v. Yost, 155 Tex. 174, 284 S.W.2d 898, 900 (1955)) (other citations
omitted).

          Here, Appellees’ “right” to
prejudgment and postjudgment interest was not “vested” until entry of the trial
court’s judgment.[14]  See
id.; accord Walls v. First State Bank, 900 S.W.2d 117, 121-22 (Tex. App.—Amarillo 1995, writ denied).  Therefore, the court erred by holding that the
prejudgment and postjudgment interest statutes are unconstitutional retroactive
laws as applied in Appellees’ case.  See Walls, 900 S.W.2d at 121-22;
 Houston Indep. Sch. Dist., 798 S.W.2d at 589-90.  Accordingly, we sustain
 Durham’s third issue and do not reach Durham’s sixth issue concerning the
summary judgment.

PREJUDGMENT INTEREST AWARD

          Durham contends in its
seventh issue that the court erred by awarding prejudgment interest on
Appellees’ award of court costs and attorney’s fees.

          Because we have concluded
that Appellees are not entitled to recover attorney’s fees, they necessarily
are not entitled to recover prejudgment interest for their attorney’s fees.

          Prejudgment interest has
been defined as “additional damages for the loss of use of money due as damages
during the period between the accrual of the claim and the date of judgment.”  Embrey
v. Royal Indem. Co., 986 S.W.2d 729, 732 (Tex. App.—Dallas 1999) (quoting LaCoure
v. LaCoure, 820 S.W.2d 228, 237 (Tex. App.—El Paso 1991, writ denied)), aff’d,
22 S.W.3d 414 (Tex. 2000); accord Chilton Ins. Co. v. Pate & Pate
Enters., 930 S.W.2d 877, 897 (Tex. App.—San Antonio 1996, writ denied); Beutel
v. Dallas County Flood Control Dist., 916 S.W.2d 685, 696 (Tex. App.—Waco
1996, writ denied).  Therefore, we hold that prejudgment interest should be
calculated based on the past damages awarded.  Court costs should not be
included in this calculation.

          Accordingly, we sustain Durham’s seventh issue.

Conclusion

The record contains legally and
factually sufficient evidence to support the jury’s award of damages for
Beettner’s and Whiddon’s past and future physical impairment and lost earning
capacity and for Thomas’s past physical impairment, lost earning capacity, and
future disfigurement.  Accordingly, we affirm that portion of the judgment
which awards these elements of damages

The evidence is factually
insufficient with regard to the damages awarded to Appellees for past medical
expenses.  Therefore, we suggest a
remittitur of $5,604.47 consisting of: (1) $192 for Beettner’s past medical
expenses; (2) $468.47 for Whiddon’s past medical expenses; and (3) $4,944 for
Thomas’s past medical expenses.  Therefore, if Appellees file a remittitur of $5,604.47
with the Clerk of this Court within twenty-one (21) days after the date of this
opinion, we will modify the trial court’s judgment to award damages for past
medical expenses of $7,895.53.[15]

However, if Appellees fail to make the suggested
remittitur, we will reverse the judgment and remand this cause for a new
trial.  See Tex. R. App. P. 44.1(b);
Estrada v. Dillon, 44 S.W.3d 558, 562 (Tex. 2001) (per curiam).

We reverse the judgment insofar as it awards
Appellees’ attorney’s fees and render judgment that Appellees take nothing on
their claim for attorney’s fees.

We reverse the judgment insofar as it awards
prejudgment interest and render judgment that Appellees recover prejudgment
interest on their past damages but not on court costs.  We reverse the judgment
insofar as it awards postjudgment interest and render judgment that
postjudgment interest shall accrue on the judgment at the rate of five percent
per annum.

 

FELIPE REYNA

Justice

Before Chief Justice
Gray,

Justice
Vance, and

Justice
Reyna

Affirmed in part,
Reversed and Rendered in part

          Remittitur
suggested

Opinion delivered and
filed July 19, 2006

[CV06]

 

 

 

 

 









[1]
          The charge instructed the jury
to assess Appellees’ damages for “loss of earnings or earning capacity” in the
future.  Although lost earnings and lost earning capacity are distinct elements
of damages, the arguments and authorities in the appellate briefs and the trial
court’s inclusion of these elements as future damages both support a conclusion
that that the issue here concerns loss of earning capacity rather than loss of
earnings.  Cf. Koko Motel, Inc. v. Mayo, 91 S.W.3d 41, 51 (Tex.
App.—Amarillo 2002, pet. denied) (“lost wages or earnings refers to the actual
loss of income due to an inability to perform a specific job from the time
of injury to the time of trial”) (emphasis added).   





[2]
          Appellees also contend that the
following excerpt from the reporter’s record shows that Whiddon’s impaired
speech was demonstrated for the jury by her inability to plainly enunciate the
word “Ford” during direct examination.  However, the record is not clear on
this issue.  Whiddon testified that the accident happened near “the Cleburne
Ford house.”  Then the following transpired:

 

            Counsel: The Cleburne what?

 

            Whiddon:            Cleburne Ford house.

 

            Counsel: Ford?

 

            Whiddon:            Yeah.

 

            Counsel: Oh, the Ford dealership.

 

It is unclear from this record whether Appellees’ counsel’s
apparent confusion stemmed from a misunderstanding of the phrase Whiddon used
to describe the dealership or from Whiddon’s alleged “difficulty saying the
word ‘Ford,’” as Appellees contend in their brief.  Counsel could have
eliminated any confusion in this regard by asking that the record be made to
reflect that Whiddon was having difficulty saying this word, if that were the
case.  See Piotrowski v. Minns, 873 S.W.2d 368, 370 (Tex. 1993) (“At
every stage of the proceedings in the trial court, litigants must exercise some
diligence to ensure that a record of any error will be available in the event
that an appeal will be necessary.”).





[3]
          The petitioners in Ramirez
did not challenge the jury’s award of damages for physical impairment in the
Supreme Court.  See Fifth Club, Inc. v. Ramirez, 49 Tex. Sup. Ct. J. 863, 869, 2006 Tex. LEXIS 638, at *23-25 (Tex. June 30, 2006) (affirming award of
future mental anguish damages).

 





[4]
          The Supreme Court in Roberts
reversed only on the lower court’s holding “that parents may recover for the
loss of filial consortium” resulting from a non-fatal injury to a child.  See
Roberts v. Williamson, 111 S.W.3d 113, 114-15 (Tex. 2003).





[5]
          Durham contends as part of its
first issue that the orthopedic surgeon’s testimony is “no evidence” because it
is conclusory.  Although an objection must be made to challenge the reliability
of an expert’s testimony, no trial objection is required “[w]hen the testimony
is challenged as conclusory or speculative and therefore non-probative on its
face.”  Coastal Transp. Co. v. Crown Cent. Petroleum Corp., 136 S.W.3d 227,
233 (Tex. 2004).  Expert testimony is considered “conclusory or speculative”
when it has no factual substantiation in the record.  See United Servs.
Auto. Ass’n v. Croft, 175 S.W.3d 457, 463-64 (Tex. App.—Dallas 2005, no
pet.); Gabriel v. Lovewell, 164 S.W.3d 835, 846 (Tex. App.—Texarkana 2005,
no pet.).  Here, the orthopedic surgeon based her opinions on her 2 physical
examinations of Thomas, Thomas’s reports of her symptoms and medical history,
CT scans, x-rays, and Thomas’s progress in physical therapy.  Accordingly, we
reject Durham’s contention that the surgeon’s testimony on its face is
conclusory or speculative.  See Welch v. McLean, 191 S.W.3d 147, 157-59
(Tex. App.—Fort Worth 2005, no pet.); United Servs. Auto. Ass’n, 175
S.W.3d at 464-67; Gabriel, 164 S.W.3d at 846.





[6]
          The parties made this
stipulation on the record in response to a note from the jury asking, “Are
there .  .  .  other past medical bills for Michael Beettner for emergency room
treatment?”

 





[7]
          Beettner and Turner were treated
at the same emergency room.





[8]
          The affidavit and accompanying
records for Dr. Chuoke reflect total billings of $1,415.  However, the last
entry on the statement is for “Prophylaxis, Adult” in the amount of $36.  Apparently,
this last entry was not for Whiddon’s treatment.





[9]
          The record actually contains 2
affidavits admitted as Plaintiffs’ Exhibits 11 and 13 for the same $387
ambulance bill.  The court also admitted 2 exhibits regarding Thomas’s
orthopedic care: Plaintiffs’ Exhibit 4 for $2,429 in services provided from
October 18, 1999 to December 13, 1999; and Plaintiffs’ Exhibit 142 for $3,019
in services provided from October 18, 1999 to June 5, 2003.





[10]
         Section 304.102 currently
provides, “A judgment in a wrongful death, personal injury, or property damage
case earns prejudgment interest.”  Tex.
Fin. Code Ann. § 304.102 (Vernon Supp. 2005).





[11]
         More precisely, the interest rate
was 10 percent per annum if the published auction rate for treasury bills was
less than 10 percent.  The applicable rate would be 20 percent if the auction
rate was more than 20 percent.  See Act of May 24, 1997, 75th Leg., R.S., ch. 1008,
§ 1, sec. 304.003(c), 1997 Tex. Gen. Laws 3091, 3435 (amended 2003) (current
version at Tex. Fin. Code Ann. § 304.003(c)
(Vernon Supp. 2005)).

 





[12]
         Another amendment to section
304.003 is that the applicable rate is now determined with reference to the
“prime rate as published by the Federal Reserve Bank of New York” rather than
the t-bill auction rate.  See Tex.
Fin. Code Ann. § 304.003(c).  The applicable rate is 5 percent if the
prime rate is less than 5 percent or 15 percent if the prime rate is more than
15 percent.  Id.





[13]
         The original quotation is found
in Ex parte Abell, 613 S.W.2d 255, 260  (Tex. 1981) (orig. proceeding).





[14]
         In fact, the jury did not even
determine that Appellees were entitled to damages until after the effective
date of the amendments to the prejudgment and postjudgment interest statutes.





[15]
         This modified award would consist
of $308 for Beettner’s past medical expenses, $2,531.53 for Whiddon’s past
medical expenses, and $5,056 for Thomas’s past medical expenses.








rtionment Plan provided that
the “Bus Crash Claimants” (which included the Plaintiffs) “may elect to accept
the percentage of the Liability Fund [the $5 million insurance proceeds and
accrued interest] specifically assigned to that individual’s claims by the
mediator as set forth in the Apportionment Schedule.”  It also provided:  “Any
Bus Crash Claimants may elect to decline acceptance of the percentage of the
Liability Fund specifically assigned to that individual’s claim in the
Apportionment Schedule,” in which case the claimant “will be bound by the terms
and conditions of the Litigation Plan.”  Some of the bus passengers accepted
the mediator’s assigned percentages and were paid under the apportionment
schedule, but all of the Plaintiffs chose to have their claims against Central Texas and Cummings resolved under the Litigation Plan.  About one-half of the $5
million was allocated in the Apportionment Plan; the other half was held for those
participating in the Litigation Plan.

3.  The Litigation Plan

Under the Litigation Plan, the
claimants were to try their cases to a verdict before a special judge and under
procedural rules agreed upon by all the participants.  The claimants were to
recover from the fund left over after payment of the apportionment claims,
which was approximately $2.5 million and was termed the Litigation Fund.  Their
recovery was capped at 110% of the percentage assigned by the mediator.

The Litigation Plan provided:

 

4)         Each participant in the
Litigation Plan agrees that any recovery from the Litigation Fund will
necessitate that the claimant prove by a preponderance of the evidence the
following factual issues:

a.         that the negligence of
Central Texas Trails, Inc., Kincannon Enterprises, Inc., Central Texas Bus
Lines, Inc., or Johnny M. Cummings was a proximate cause of the participant’s
injuries and/or damages; and 

b.         the amount of damages
suffered by the claimant as a result of that negligence.

 

            Neither the Litigation
Plan nor the bankruptcy court’s approval order included a schedule or deadlines
for the Plan’s implementation and disposition.  In October 2004, after having
confirmed Central Texas’ reorganization plan, the bankruptcy court entered a
final decree closing the bankruptcy case, even though nothing had occurred
under the Litigation Plan.

The Plaintiffs’ case against MCI was
tried in October 2005.[15] 
In offers of proof, MCI elicited testimony from many of the Plaintiffs about
their proofs of claims against Central Texas in the bankruptcy case.  The Plaintiffs
testified that they had not made claims in the bankruptcy case against Central Texas, that they did not blame Cummings for the accident, and that they were not
aware of the details of the Apportionment Plan.  After the trial, Donnie
Hagans, a claimant who had accepted payment under the Apportionment Plan, filed
a motion in the bankruptcy court “to withdraw, strike or deny” the Plaintiffs’
proofs of claims based on their inconsistent offer-of-proof testimony.

The bankruptcy court held show-cause hearings
in January 2006 on these motions and noted significant flaws in the Litigation
Plan:  it did not contain a provision for getting money paid out of the
Litigation Fund; it did not provide for the disposition of any leftover funds;
and it had no deadlines or schedules.  Thereafter, the Plaintiffs agreed on a “Special
Judge,” and the bankruptcy court ordered the Bus Crash Claimants (the Plaintiffs)
to submit evidence to the Special Judge by February 6, 2006 and to appear on
that date at the office of one of the attorneys for several of the Plaintiffs
to present oral argument or testimony before the Special Judge.  Central Texas was given the opportunity to appear before and submit evidence to the Special
Judge; MCI was not.  The Special Judge was given until March 15, 2006 to render
a verdict and report and file them with the bankruptcy court.  The order
included the following stipulation:

The Litigation Plan Participants [the Plaintiffs]
will not move for judgment on the state court verdict prior to the final
approval of disbursements, if any, to the Litigation Plan Participants in the
Bankruptcy Court absent extenuating circumstances.  The Litigation Plan
Participants will not oppose a motion filed by Motor Coach in the state court
action for credits on the judgment based upon the “one satisfaction rule” as a
result of the receipt of any funds disbursed to them from the Litigation Plan. 
However, the Litigation Plan Participants will oppose any motion filed by
Motor Coach Industries which seeks to deem funds disbursed form the Litigation
Fund to be “settlement credits,” or a settlement under Chapter 33 of the Texas
Civil Practice and Remedies Code.  [Emphasis added.]

 

            The Special Judge rendered
a “Special Verdict, Report and Recommendation” after conducting the February 6
“hearing.”  It included a recitation of all of the materials that the Special
Judge had reviewed (including the reporter’s record in this case) and a listing
of the parties appearing on February 6.  No one appeared on behalf of Central Texas or Cummings.  The Special Judge made the following liability “finding”:

            Based on the materials I
have reviewed, it is my determination that the negligence of the bus driver,
Mr. Johnny Cummings, was a proximate cause of the accident that produced the
Participants’ [Plaintiffs’] injuries and damages.  I further find that Mr.
Cummings was acting within the course and scope of his duties for one or more
Debtors [Central Texas].  Therefore, under Texas law, one or more Debtors are
vicariously liable for his negligence.

 

            I have not endeavored,
based upon my understanding of my duties under this Court’s Order, to make a
complete or comparative assessment of all parties potentially liable for
causing either the accident or the resulting damages.

 

            The Special Judge adopted
the MCI trial’s jury findings as a cap on the damages award and then made a
slight adjustment to the percentages found by the mediator.  The bankruptcy
court approved the Special Judge’s finding, and each Plaintiff received within
2% of the amount allocated in the Apportionment Plan, except for Robert Kuryla,
whose award was reduced because the jury had awarded him less than his allocation.

            MCI then moved the trial
court for a settlement credit for the Central Texas insurance monies paid to
the Plaintiffs from the bankruptcy court.  But rather than giving a settlement
credit, the trial court recited in the final judgment that it has been
“partially satisfied” as to each Plaintiff in the exact amount that each had
received from the Litigation Fund.

4.  Chapter 33

As noted above, the statutory scheme
under the 1995 version of Chapter 33 applies to this case.  It applied to a broad
range of cases, including “any cause of action based on tort in which a
defendant, settling person, or responsible third party is found responsible for
a percentage of the harm for which relief is sought.”  Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1,
1995 Tex. Gen. Laws 971, 971 (current version at Tex. Civ. Prac. & Rem. Code Ann. § 33.002 (Vernon Supp. 2007)).  Former section 33.003 provided that the
trier of fact shall determine the percentage of responsibility for each
claimant, each defendant, each settling person, and each responsible
third party who has been joined under section 33.004.  Id. at
1995 Tex. Gen. Laws 971, 972-73 (amended 2003) (current version at Tex. Civ. Prac. & Rem. Code Ann. §
33.003 (Vernon Supp. 2007)); see also Tex.
R. Civ. P. 277 (requiring trial court to submit jury question when loss
is to be apportioned).  “Settling person” was defined
by former section 33.011(5) as “a person who at the time of submission has paid
or promised to pay money or anything of monetary value to a claimant at any
time in consideration of potential liability . . . for which recovery of
damages is sought.”  Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.07,
1987 Tex. Gen. Laws 37, 41 (amended 1995 and 2003) (current version at Tex. Civ. Prac. & Rem. Code Ann. §
33.011(5) (Vernon Supp. 2007)).

Former section 33.013 provided, with certain
exceptions, that a defendant was liable only for the percentage of
responsibility found by the trier of fact, unless the percentage of
responsibility exceeded fifty percent, in which case that defendant was jointly
and severally liable for all of the claimant’s recoverable damages.[16] 
It was therefore plainly in MCI’s interest to have Central Texas’ conduct (or
that of Cummings, for whom Central Texas was vicariously liable) submitted to
the jury to reduce MCI’s percentage of responsibility, if any, and at a minimum
to determine if its percentage of responsibility was under 51%, which would
allow it to avoid joint and several liability for all of the Plaintiffs’
damages.  Conversely, because Central Texas was in bankruptcy, it was in the Plaintiffs’
interest to have MCI found 100%, or at least 51%, responsible.

5.  Discussion and Analysis

 

            Based on the above, we now
must determine whether Central Texas was a “settling person” under Chapter 33. 
That is, we address whether or not the Litigation Plan was a “settlement”
between Central Texas and the Plaintiffs such that Central Texas was a
“settling person” whose proportionate responsibility should have been submitted
to the jury along with that of MCI.  See C & H Nationwide, Inc. v.
Thompson, 903 S.W.2d 315, 320 (Tex. 1994) (“‘settlement’, as used in the
Comparative Responsibility Law, means money or anything of value paid or
promised to a claimant in consideration of potential liability”).

As a threshold matter, we review MCI’s
contention that legally sufficient evidence supported the submission of Central Texas’ proportionate responsibility.  In
addition to the statutory definition of settling person, former section
33.002(f) also required sufficient evidence to support the submission of that
person’s conduct in a proportionate responsibility question.  Act of May 8,
1995, 74th Leg., R.S., ch. 136, § 1, 1995 Tex. Gen. Laws 971, 972 (amended
2003) (current version at Tex. Civ.
Prac. & Rem. Code Ann. § 33.003(b (Vernon Supp. 2007)).  We review
that person’s conduct for legal sufficiency.  Olympic Arms, Inc. v. Green,
176 S.W.3d 567, 573 (Tex. App.—Houston [1st Dist.] 2004, no pet.).  MCI points to evidence that Cummings was driving too fast,
that he drove the bus into head-on traffic, and that the tread on one of the
rear bus tires was too thin for the wet road conditions.  The Plaintiffs make
no argument that the evidence was legally insufficient.  We conclude that there
is some evidence to support the submission of Central Texas’ conduct in a
proportionate responsibility question.

            We begin our settling-person
analysis by noting that the Plaintiffs asserted tort claims against Central Texas in their bankruptcy proofs of claims.  MCI asserts that Central Texas’
liability insurer’s tender of the $5 million policy limits to the bankruptcy
court was a payment to the Plaintiffs in consideration of Central Texas’
potential liability.  The Plaintiffs argue that the money was tendered not to
them, but to the bankruptcy court, and only because the bankruptcy court
ordered it.  That is only partially correct.

It is apparent from the various
bankruptcy court documents (particularly the Dobelbowers’ various motions
relating to the $5 million policy proceeds and ADR procedures and the other
parties’ motions and responses relating to ADR) that all of the parties—the Bus
Crash Claimants, Central Texas, and its liability insurer—were engaged in
extensive, detailed discussions and negotiations over the $5 million and its fair
division among all the claimants.  Additionally, it appears that neither Central Texas nor its insurer opposed tendering the $5 million or participating in ADR
proceedings to apportion the $5 million.[17]

            Moreover, Central Texas’
Second Amended Plan of Reorganization, which the Plaintiffs voted for and which
the bankruptcy court approved, delineated the Bus Crash Claimants as a class of
creditors with wrongful death and personal injury damages against Central Texas
arising out of the crash and provided:  “The Debtor [Central Texas] shall pay
$7,000 annually to this class of creditor for five years.”  These payments began
in 2004 and went partly into the Litigation Fund to be distributed under the
Litigation Plan.  We are now led to the crucial aspect of our inquiry:  Did the
Litigation Fund, which consisted of half of the insurance proceeds and Central
Texas’ direct annual payments, and the Litigation Plan, through which each Plaintiff’s
claim for a percentage of the Litigation Fund was “adjudicated,” constitute payments
to the Plaintiffs in consideration of potential liability and thereby
render Central Texas a “settling person”?  (Or more broadly, was the Litigation
Plan a settlement between Central Texas and the Plaintiffs?)  We answer “yes.”

The tender of the $5 million to the
bankruptcy court (half of which went to the Litigation Fund) and Central Texas’
direct annual payments to the Litigation Fund, were indirect payments to the
Plaintiffs in consideration of Central Texas’ potential liability to the
Plaintiffs, and the subsequent payments from that fund to the Plaintiffs were
not contingent on the outcome of an adversarial or uncertain proceeding.  Cf.
Gilcrease v. Garlock, Inc., 211 S.W.3d 448, 452-55 (Tex. App.—El Paso 2006,
no pet.) (holding that post-settlement bankruptcies of settling parties did not
make settlements contingent and that defendant was entitled to credits, even
though settlements had not been paid, and distinguishing settlements contingent
on other litigation and uncertain bankruptcy proceedings) (citing McNair v.
Owens-Corning Fiberglas Corp., 890 F.2d 753 (5th Cir. 1989), and Cimino
v. Raymark Indus., 751 F. Supp. 649 (E.D. Tex. 1990), aff’d in part,
vacated in part on other grounds, 151 F.3d 297 (5th Cir. 1998)).

            The Plaintiffs contend
that, because the hearing before the Special Judge and the bankruptcy court’s
order approving the Special Judge’s report and the disbursements to the Plaintiffs
occurred several months after the trial against MCI, there had been no
adjudication or disbursements—no payments or promises to pay—out of the
Litigation Fund at the time the case was submitted to the jury in the MCI trial. 
The statute, however, defines a settling person as one who pays or promises to
pay “at any time.”  Thus, we give no weight to the timing of the Litigation
Plan’s hearing, verdict, and actual disbursements;[18] as of the time of submission of this
case to the jury, the Litigation Plan had been in place for over two years.  We
also give no credence to the ipse dixit statement in Central Texas’
reorganization plan that “[s]ome of the bus crash claimants [the Plaintiffs]
have not settled their claims against the Debtors [Central Texas]” and continue
to be participants in the Litigation Plan.

The Plaintiffs’ other arguments for
why the Litigation Plan was not a settlement are that their claims against
Central Texas were not settled, but were “adjudicated” under the bankruptcy
court’s orders (via the Litigation Plan), that they were required to
prove Central Texas’ negligence and their damages to the Special Judge to
receive money from the Litigation Fund, and that they were exposed to receiving
less money than originally allocated to them by the mediator.  We are not
persuaded.

            Although the bankruptcy
court entered an order approving the Litigation Plan, that plan was prepared by
and agreed to by the Plaintiffs.  Extensive negotiations took place before and
after the mediation in which all the Bus Crash Claimants, including the
Plaintiffs, agreed to an apportionment schedule in which each claimant was
assigned a specific percentage of the Litigation Fund.  Negotiations with
Central Texas and its insurer also took place, and in its reorganization plan, Central Texas agreed to pay $7,000 a year for five years to benefit the Litigation Fund. 
The Plaintiffs, as a class of creditors, voted for this plan, which also
included a provision discharging Central Texas from all debts, including the
Plaintiffs’ tort claims.

The Litigation Plan was structured to make
the payments from the Litigation Fund to the Plaintiffs appear to be contingent
on an adjudicative proceeding, but piercing it reveals no adversarial
adjudication or uncertainty to render it contingent, and it has several indicia
of a settlement.  Cf. Turoff, 222 S.W.3d at 668 (“But the law on Mary Carter
Agreements in Texas has evolved to include agreements that violate the
principles laid out in Elbaor even if the precise structure of the
agreement does not fit the precise pattern of an agreement previously determined
to be in violation of public policy.”).  The money
paid into the Litigation Fund was apparently nonrefundable, and thus
unconditional; i.e., nothing provided for its return or other disposition
if the Plaintiffs did not prove the negligence of Central Texas or Cummings to
the Special Judge.  The Litigation Fund was plainly earmarked to be distributed
to the Plaintiffs in the approximate percentages agreed to at the 2004 mediation. 
We have no reason to believe that the Special Judge acted other than in good
faith, but the “hearing” before him was not adversarial.  No interested parties
(e.g., Central Texas, Cummings, or MCI) participated to argue that Central Texas and Cummings were not negligent or to contest the Plaintiffs’ injuries or the
amount of their damages.[19] 
The payments that were to be made to the Plaintiffs as a result of the
proceeding before the Special Judge were not contingent so as to render the
Litigation Plan not a settlement for purposes of Chapter 33.

We summarize:  As a result of the
crash, Central Texas was potentially liable to the Plaintiffs; all of Central
Texas’ liability insurance proceeds were earmarked for the crash victims, and
half of those proceeds, along with direct payments from Central Texas, were
placed in a fund to be allocated among the Plaintiffs under procedures set up
and controlled by the Plaintiffs with no adversary; the Plaintiffs voted for
Central Texas’ reorganization plan, which discharged all of Central Texas’
debts, including its debts for the Plaintiffs’ tort claims; all of the
Plaintiffs received the approximate apportionment percentages that had been
agreed to at the original mediation; and the payments were made to the
Plaintiffs plainly in consideration of Central Texas’ potential liability to
them.  This process was hardly a typical tort settlement, but it was a
settlement and Central Texas was a settling person for purposes of Chapter 33. 
For these reasons, we hold that Cummings and Central Texas were “settling
persons” under Chapter 33 and that the trial court erred in refusing MCI’s
request to submit their proportionate responsibility to the jury.  See Omega
Contracting, 191 S.W.3d at 837; Olympic
Arms, 176 S.W.3d at 575.

            We last address whether
the trial court’s error was harmful and warrants reversal.  A reversal is
warranted if the trial court denies a proper submission of a settling person’s
proportionate responsibility, and the error probably caused the rendition of an
improper judgment.  See Tex. R.
App. P. 44.1; Olympic Arms, 176 S.W.3d at 576.

We found above that there was legally
sufficient evidence of Central Texas’ and Cummings’s negligence.  It is thus probable
that the jury would have placed some of the responsibility on them, and if
MCI’s proportionate responsibility were found to be less than 51%, it would
have been liable for only its percentage of responsibility.  Because the trial
court’s erroneous refusal to submit Central Texas or Cummings caused MCI to be
100% liable, that error was reasonably calculated to cause, and probably
caused, the rendition of an improper judgment.  See Olympic Arms, 176 S.W.3d at 576.  We sustain in part MCI’s first issue.

V.  Issues Not Addressed

 

Because of our disposition of MCI’s
first issue, we will not address MCI’s factual sufficiency complaints in issues
four and five, nor will we address MCI’s second (refusal to permit
cross-examination) and seventh (charge error) issues.  See Tex. R. App. P. 47.1.

VI.  Conclusion

 

            Having sustained in part MCI’s first
issue, we reverse the trial court’s judgment and remand this cause for further
proceedings consistent with this opinion.

 

 

 

BILL VANCE

Justice

 

Before Chief Justice
Gray,

            Justice
Vance, and

            Justice Reyna

            (Chief
Justice Gray dissenting)

Reversed and remanded 

Opinion delivered and
filed September 10, 2008

[CVPM]









[1]               MCI joined Marcopolo, S.A., a Brazilian company that manufactured component parts of the bus, as a
responsible third party, and also filed a third-party action against
Marcopolo.  Marcopolo made a special appearance, which the trial court
sustained, and it severed MCI’s third-party action against Marcopolo.  In MCI’s
appeal of the special appearance ruling, we affirmed the trial court’s
decision.  See Motor Coach Indus., Inc. v. Marcopolo, S.A., 2007 WL 4157241 (Tex. App.—Waco Nov. 21, 2007, no pet.).  MCI’s eighth issue contends that, if the trial court erred
by granting Marcopolo’s special appearance, its severance of MCI’s
third-party action against Marcopolo would have been
erroneous and the judgment should be reversed.  Because we affirmed the trial
court’s decision on Marcopolo’s special appearance, we overrule MCI’s eighth
issue.





[2]               Two Texas
Supreme Court decisions have addressed the implied preemption of state
common-law tort claims by federal motor vehicle safety standards:  Hyundai
Motor Co. v. Alvarado, 974 S.W.2d 13 (Tex. 1998) (holding that the Safety
Act and FMVSS 208 did not expressly or impliedly preempt a tort claim based on
the manufacturer’s failure to install lap belts); and Great Dane Trailers,
Inc. v. Estate of Wells, 52 S.W.3d 737, 744-49 (Tex. 2001) (holding that the
Safety Act and FMVSS 108 did not impliedly preempt common-law “conspicuity” tort
based on inadequate lighting and reflectors on truck trailer).





[3]               While not determinative, we note
that the National Transportation Safety Board, which investigates
transportation accidents but has no regulatory power in the area of safety
standards for motor vehicles, has repeatedly recommended passenger seatbelts
for motor coaches since 1968.





[4]               The Court also construed the Safety
Act’s preemption clause and saving clause together, concluding that the Safety
Act does not expressly preempt “nonidentical state standards established
in tort actions covering the same aspect of performance as an applicable
federal standard.”  Geier, 529 U.S. at 868, 120 S.Ct. at 1918. 





[5]               And as we stated above, there has been no clear federal expression of opposition to
the installation of passenger seatbelts in motor coaches.  In fact, the
Plaintiffs have asked us to take judicial notice on appeal of NHTSA’s most
recent motor coach safety paper that contradicts MCI’s recitation of NHTSA’s
view of passenger seatbelts in motor coach buses.  See Tex. R. Evid. 201; Office of Pub.
Util. Counsel v. P.U.C., 878 S.W.2d 598, 600 (Tex. 1994) (court of appeals
erred in refusing to take judicial notice of published P.U.C. order) (“To be
the proper subject of judicial notice, a fact must be ‘capable of accurate and
ready determination by resort to sources whose accuracy cannot reasonably be
questioned.’  Tex. R. Civ. Evid.
201.  Judicial notice is mandatory if ‘requested by a party and [the court is]
supplied with the necessary information.’  Tex.
R. Civ. Evid. 201.  A court of appeals has the power to take judicial
notice for the first time on appeal.”).

That paper is a NHTSA document
released on August 6, 2007, entitled “NHTSA’s Approach to Motorcoach Safety,”
authored by Roger A. Saul, NHTSA’s director of its Office of Crashworthiness
Standards, and filed in NHTSA’s Docket No. 2007-28793 (“Motorcoach Safety
Plan”) (available at http://www.nhtsa.dot.gov/staticfiles/DOT/NHTSA/Vehicle%20Safety/Articles/Associated%20Files/481217.pdf).  It begins by noting its goal: “to present a
comprehensive review of motorcoach safety issues and the course of action the
National Highway Traffic Safety Administration will pursue to most expediently
address them.”  Id. at 1.  Regarding seatbelts, the paper states:

Seat belts are another approach for potential
improved motorcoach occupant protection in crashes.  Installing seat belts
would be the most direct method of retaining passengers within the seating
compartment. . . .   Seat belts could also potentially provide protection in
multiple crash modes, including rollover, and prevent ejection.

Both Australia and Europe require seat belts on
motorcoaches.  Australian Design Rule (ADR) 68 has required lap and shoulder
belts since 1994.  In Europe, ECE R.80 Amendment 1 has required a lap belt or a
lap/shoulder belt since 1998.

Id. at 12-13.

                The seatbelt section of the paper concludes with
NHTSA’s planned approach of conducting crash tests to obtain information to
develop FMVSS 210-type performance requirements for the seatbelt assembly and
seat anchorages.  Id. at 14.





[6]               MCI also relies on two unpublished trial court decisions
that were not appealed:  Surles v. Greyhound Lines, Inc., 2005 WL
1703153 (E.D. Tenn. July 20, 2005), and Schunck v. Delaware Transit Corp.,
2007 WL 1748647 (Del. Super. Ct. June 1, 2007).  Surles, like this case,
involved a claim that seatbelts should have been installed on an MCI bus
operated by Greyhound.  The district court focused—incorrectly under Sprietsma,
in our view—on “whether a common law claim would conflict with the agency’s reasons
for declining to regulate.”  Surles, 2005 WL 1703153, at *6.  In Sprietsma,
the Court took full note of the Coast Guard’s explanation why it did not
require propeller guards, and that decision did not convey an authoritative
message of a federal policy against propeller guards.  Sprietsma, 537 U.S. at 61-62, 66-67, 123 S.Ct. at 525-28.  Likewise, NHTSA has not conveyed an
authoritative message against passenger seatbelts in motor coach buses.  We disagree
with Surles.  We disagree as well with the analysis in Schunck,
which also concerned a claim that seatbelts should have been installed on a
transit bus.  There the trial court focused—incorrectly in our view—on a
supposed “10,000 pound weight standard” and on the fact that NHTSA requires
passenger restraints on buses weighing less than 10,000 pounds.  Schunck,
2007 WL 1748647, at *3.  That analysis, like the one in Surles, misses
the mark set in Myrick and Sprietsma and misapplies Geier.

                We find inapposite Hurley
v. Motor Coach Indus., Inc., 222 F.3d 377 (7th Cir. 2000), which involved
claims by a bus driver that MCI’s bus was defective because it was equipped
only with a two-point lap belt.  Hurley did not involve passenger
seatbelts, and because FMVSS 208 does regulate bus driver restraint and
protection systems and provides options for bus driver restraint systems, Geier
did apply to impliedly preempt the plaintiffs’ claims that a three-point
seatbelt, an airbag, and a steel cage for the driver were all required.  Id. at 380-82.

 





[7]               49 U.S.C. § 30103(e) (“Compliance
with any Federal motor vehicle safety standard issued under this subchapter
does not exempt any person from any liability under common law.”).





[8]               The term
“laminated glass” means two or more pieces of sheet, plate, or float glass
bonded together by an intervening layer or layers of plastic material.  It will
crack or break under sufficient impact, but the pieces of glass tend to adhere
to the plastic.  If a hole is produced, the edges are likely to be less jagged
than would be the case with ordinary annealed glass.  ANSI/SAE Z26.1-1996 §
1.6.

The term “tempered glass” means a
single piece of specially treated sheet, plate, or float glass possessing
mechanical strength substantially higher than annealed glass.  When broken at
any point, the entire piece breaks into small pieces that have relatively dull
edges as compared to those of broken pieces of annealed glass.  Id. at § 1.21.





[9]               Dr. Khadilkar added that the risk
of an “out-of-position” seatbelt injury is far less in a bus than in a car
because cars have such a lower mass.





[10]             This case is governed by the version
of chapter 33 in effect before July 1, 2003 because this action was filed
before that date.  See Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§
4.05, 23.02(c), 2003 Tex. Gen. Laws 847, 856, 899.

                





[11]             See In re Grant Thornton, L.L.P., 2004 WL 114978, at *2 (Tex. App.—Houston [14th Dist.] Jan.
26, 2004, no pet.) (mem. op.) (“The express language of the Proportionate
Responsibility Statute in effect for this case requires that responsible third
parties be joined in the lawsuit, not simply named or designated. . . . 
Sub-sections 33.004(d) and (e) also use the word “join” and discuss filing a
third party claim to bring responsible third parties into a lawsuit.”); see
id. at n.2 (“Because this action was filed before July 1, 2003, relator was
required to serve responsible third parties.”).

 





[12]             Moreover, in the five-month period after filing its motion
for leave, MCI appears to never have served Cummings and Central Texas with
MCI’s third-party petition joining them as responsible third parties.  See,
e.g., In re Grant Thornton, 2004 WL 114978, at *2 (“Because relator’s
designated responsible third parties were never served with a petition and
citation, they were not parties to the suit at the time the court purportedly
struck them.”).  The Plaintiffs additionally assert that this lack of due
diligence raised a statute of limitations problem for MCI as to Cummings and Central Texas.

 





[13]             The Plaintiffs note that as of July
15, the parties were engaged in final trial preparation, discovery had closed,
and trial was scheduled to begin in two weeks.





[14]             For example, Appellee James Hinton
was assigned 6.5010% of the insurance proceeds.





[15]             Before
trial, in September 2005, MCI and its affiliate companies who were creditors in
 Central Texas’ bankruptcy had filed a motion to reopen the bankruptcy case and
a motion to enforce the Litigation Plan, complaining that no action had taken
place to implement the Litigation Plan.  MCI contended that the Plaintiffs
should be prohibited from obtaining a double recovery—one from the Litigation
Plan and one from the state-court suit against MCI—and that, should the
Plaintiffs obtain a judgment against MCI, it should receive a credit for any
amounts received by the Plaintiffs under the Litigation Plan.





[16]             Act of May 17, 1985, 69th Leg., R.S.,
ch. 959, § 1, 1985 Tex. Gen. Laws 3242, 3271 (amended 1987, 1995, and 2003) ((current version at Tex. Civ. Prac. & Rem. Code Ann. § 33.013 (Vernon Supp. 2007)).





[17]             The only major dispute between the
Bus Crash Claimants and Central Texas and its insurer was whether the claimants
would have to fully release Central Texas, Cummings, and the insurer.





[18]             We acknowledge MCI’s note on the
treatment that the trial court’s final judgment gives to the Litigation Fund
payments to the Plaintiffs—as partial satisfactions of the judgment, rather
than as settlement credits.  But Central Texas was not a party to the judgment
and thus could not have partially satisfied it, and these payments came from
the Litigation Plan and were funded by Central Texas and its liability insurer
in consideration of Central Texas’ potential liability.





[19]             We view the Litigation Plan as a
good-faith, albeit unsuccessful, attempt to avoid the possible detriment
to the Plaintiffs if Central Texas’ proportionate responsibility were submitted
to the jury.  Indeed, it had the stamp of approval of the bankruptcy court.